# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARREN DODSON,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES CAPITOL POLICE,<br><br>*Defendant*. | Civil Action No. 18-2680 (RDM) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Arren Dodson brings this action against Defendant United States Capitol Police ("Capitol Police") pursuant to the Congressional Accountability Act ("CAA"), 2 U.S.C. §§ 1301–11, which subjects various legislative branch agencies to certain laws, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Plaintiff asserts three claims: a claim of race discrimination, Dkt. 1 at 7; a claim of retaliation, *id.* at 8; and a procedural due process claim, *id.* at 9. Defendant moves to dismiss all three claims. *See* Dkt. 13. For the reasons explained below, the Court will deny Defendant's motion.

## I. BACKGROUND

**A. Factual Background**

For purposes of the pending motion to dismiss, the following allegations, which are taken from Dodson's complaint, are accepted as true. *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011); *see also EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice.").

Plaintiff Arren Dodson is a former United States Capitol Police Officer. Dkt. 1 at 3, 7 (Compl. ¶¶ 10, 40). He is "an African American." *Id.* at 3 (Compl. ¶¶ 9). Over the course of his employment with the Capitol Police, Dodson "regularly spoke out about" the Capitol Police "treating him less favorably than his Caucasian colleagues." *Id.* at 3 (Compl. ¶ 15). He alleges that the disciplinary actions—one for insubordination and one for unsatisfactory performance—that led to his termination from the Capitol Police were the "[m]ost recent[]" examples of such disfavored treatment. *Id.* at 3 (Compl. ¶ 16); *see id.* at 4 (Compl. ¶¶ 19–20).

On January 17, 2018, Dodson felt ill but thought he was well enough to work his assigned shift that began on that day. *Id.* at 4 (Compl. ¶ 21). Towards the end of his shift, which spanned into January 18, 2018, he was informed that "he would be required to work additional duty into the next shift." *Id.* Because Dodson's name appeared towards the bottom of the list that provided the order in which officers would be asked to work additional duty—this list is known as "the unscheduled draft list"—he inquired why he was being asked to work additional duty. *Id.* at 4–5 (Compl. ¶¶ 21–22). He "learned that all of the employees who had been scheduled to work additional duty for that date went home with no negative consequence." *Id.* at 5 (Compl. ¶ 22).

Upon learning of his counterparts' departures, Dodson told his supervisor "that he had an ear infection and a migraine" and was therefore "unable to continue working." *Id.* Despite excusing employees who were supposed to be assigned to additional duty before Dodson, Dodson's supervisor "ignored [Dodson's] assertions that he was not fit to complete another shift, resulting in [an] improper order that he remain on-duty, even though he had properly notified management of his illness." *Id.* (Compl. ¶ 23). Dodson left work anyway and went home and to the doctor, *id.* (Compl. ¶ 24), where he was diagnosed with an ear infection in both ears,

prescribed a course of antibiotics, and given "a note permitting him to return to work as soon as January 19, 2018, *only if he was feeling better*, and seven to ten days later if he was not," *id.* (Compl. ¶¶ 25–26). Dodson did not return to work until January 24, 2018. *Id.* (Compl. ¶ 28).

Dodson provided Sergeant Brown with the doctor's note, which Sergeant Brown rejected as "insufficient" to excuse Dodson's departure from work and would not explain why. *Id.* at 5–6 (Compl. ¶¶ 29–30). Dodson brought Brown yet another doctor's note, which was similarly rejected as insufficient without explanation. *Id.* at 6 (Compl. ¶ 31). "Past practice of [the Capitol Police] ha[d] been to provide a doctor's note that outline[d] for how long an employee should take sick leave." *Id.* (Compl. ¶ 33). And, "[a]t no time" did any of the Capitol Police provide guidance to Dodson concerning how to document his sick leave. *Id.* (Compl. ¶ 32).

On April 30, 2018, as a result of Dodson's departure from work on January 18, 2018 and related absence, he received disciplinary citations for insubordination and for unsatisfactory performance, carrying corresponding recommended penalties of a two-day suspension and termination, respectively. *See id.* at 4 (Compl. ¶¶ 18–20). At the same, the Capitol Police informed Dodson: "As you know, under the terms of the June 28, 2016 Last Chance Agreement ("LCA") entered into by you and the Department, your receipt of any sustained CP-535 discipline is a violation of the LCA that will result in the termination of your employment, and you are not entitled to an appeal, grievance or any other challenge of the recommended termination." *Id.* at 6 (Compl. ¶ 34). On May 4, 2018, Dodson provided "additional information that he believed was relevant to the disciplinary actions" to the Chief of Police, Matthew Verderosa, "but it was rejected." *Id.* (Compl. ¶ 36). Five days later, Chief Verderosa notified Dodson "that he had accepted the recommendation" to terminate Dodson and planned to "forward his recommendation" to the Capitol Police Board within five days if Dodson "did not

3

resign." *Id.* at 6–7 (Compl. ¶ 37). Dodson did not resign. *Id.* at 7 (Compl. ¶ 39). He was then notified by the Capitol Police on July 2, 2018, that he had been terminated effective June 26, 2018. *Id.* (Compl. ¶ 40).

**B.   Procedural Background**

On November 19, 2018, Dodson filed this lawsuit. *See id.* at 1. In alleges that the Capitol Police's disciplinary actions that led to his termination violated the CAA, *id.* at 7–9, which incorporates the prohibitions on discrimination and retaliation contained in Title VII of the Civil Rights Act, 2 U.S.C. § 1311(a)(1). He also alleged that the Capitol Police's actions violated his Fifth Amendment right to procedural due process. Dkt. 1 at 9. The Capitol Police moves to dismiss his claims insofar as they allege an unlawful hostile work environment for lack of subject matter jurisdiction, and it moves to dismiss all of the counts of the complaint for failure to state a claim. *See* Dkt. 13-1.

## II.   LEGAL STANDARD

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) "test[] the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). This examination requires the Court to "first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)) (alterations in original) (internal citation omitted). That "facial plausibility" requires that it "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A plaintiff need not make "detailed factual allegations" to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v.*

4

*Twombly*, 550 U.S. 544, 555 (2007), but "a complaint must contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Thus, a complaint may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56 (quotation marks omitted).

### III. ANALYSIS

**A. Hostile Work Environment**

The Capitol Police first moves to dismiss Dodson's "hostile work environment claim" on the grounds that it is both not administratively exhausted and that it fails to state a claim. *See* Dkt. 13-1 at 14, 22. But Dodson's complaint does not plead a claim for hostile work environment. To be sure, the complaint does allege that Dodson was subject to "severe and pervasive harassment" in a single paragraph in describing the factual background, Dkt. 1 at 3 (Compl. ¶ 14), but the substantive counts of the complaint are clear. Count I alleges a claim for "race discrimination" based on Defendant's alleged "disparate treatment" of Dodson and based on Defendant's imposition of discipline on Dodson "for conduct that" did not result in discipline "when committed by" Dodson's "Caucasian colleagues." *Id.* at 7–8 (Compl. ¶¶ 41–46). Count II alleges a claim for retaliation based on the disciplinary action the Capitol Police took against Dodson. *Id.* at 8–9 (Compl. ¶¶ 47–54). And, Count III alleges that the Capitol Police violated Dodson's right to procedural due process. *Id.* at 9 (Compl. ¶¶ 55–61). Nowhere does the complaint allege a claim for a hostile work environment, perhaps because Dodson agrees with the Capitol Police that he never exhausted that claim.

Perhaps prompted by Defendant's misreading of the complaint, Dodson asserts in his opposition brief that the complaint alleges a hostile work environment claim. Dkt. 15 at 7–9. But that is not what the complaint says, and the Court declines to permit Dodson to amend his complaint in an opposition brief—even where the Capitol Police has misread the complaint to assert such a claim. "It is 'axiomatic' that a party may not amend his complaint through an opposition brief." *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014). To the extent Dodson has now decided to pursue such a claim—distinct from the disparate treatment claim he has alleged—he should prepare a proposed, amended complaint, and should file a motion seeking leave to file that amended complaint. *See* Fed. R. Civ. P. 15(a)(2).

**B.     Disparate Treatment**

The first count of the complaint alleges that the Capitol Police intentionally discriminated against Dodson in violation of the CAA and Title VII. Dkt. 1 at 7–8 (Compl. ¶¶ 41–46). "To establish a prima facie case of disparate treatment under Title VII, a plaintiff must show that '(1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination.'" *Clark v. Johnson*, 206 F. Supp. 3d 645, 659 (D.D.C. 2016) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002)). Where a plaintiff asks the Court to infer discrimination by comparing his treatment to that of a similarly situated employee, the plaintiff "must also demonstrate that all of the relevant aspects of his employment situation were nearly identical to those of the other employee." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 324 (D.C. Cir. 2015) (internal quotations and alterations omitted).

The Capitol Police contend that Dodson has failed adequately to plead a claim for disparate treatment because he has not alleged that any White (or even non-Black) counterparts

*subject to an identical last chance agreement* received more favorable treatment than he did. *See* Dkt. 13-1 at 11–12. But, the text of the last chance agreement, as excerpted in Dodson's complaint, demonstrates that it only affects the consequences of disciplinary actions, not whether an employee has, in fact, violated Capitol Police policies. *See* Dkt. 1 at 3–4 (Compl. ¶ 17) ("Officer Dodson agrees that any future sustained [disciplinary action] . . . which results in suspension without out pay . . . will result in termination of his employment . . . ."). Thus, insofar as Dodson alleges disparate treatment in the decision to terminate him as a result of the disciplinary citation he received, the last chance agreement would be relevant to making a comparison to a similarly situated employee for purposes of that claim. It is not relevant—or at least dispositive at the pleading stage—however, to Dodson's claim that he was not allowed to depart, was reprimanded for departing, and was not permitted to justify his absence with a doctor's note, when similarly-situated, non-Black officers were subjected to more lenient treatment. *Id.* at 4–7 (Compl. ¶¶ 22, 30–32, 44–45). With respect to *that* claim of disparate treatment, the last chance agreement is not a "relevant aspect" of the employment situation such that Dodson would need to allege that any non-Black employees with last chance agreements were treated differently. *See Burley*, 801 F.3d at 324.

Accordingly, the Court rejects the Capitol Police's motion to dismiss Dodson's disparate treatment claim.

**C.     Retaliation**

Title VII forbids an "employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 63 (2006); 42 U.S.C. § 2000e-3(a), and that prohibition extends to legislative agencies by virtue of the CAA, 2 U.S.C. § 1317(a). The anti-retaliation

7

provision has two clauses, the "opposition clause" and the "participation clause." *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 274 (2009). Under the "opposition clause," it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Under the "participation clause," it is unlawful for an employer to discriminate against an employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.*

1. *Participation Clause*

The Capitol Police contends that Dodson has failed to state a claim under the "participation clause" which prohibits retaliation where employees have "initiated proceedings, made a charge or testified, assisted, or participated in a hearing or other proceeding" under the CAA. Dkt. 13-1 at 21–22 (quoting 2 U.S.C. § 1317(a)). But Dodson's complaint alleges only unlawful retaliation on the theory that he engaged in protected activity under the opposition clause. *See* Dkt. 1 at 8–9 (Compl. ¶ 47–54). And, he makes no argument otherwise in his brief. *See* Dkt. 15 at 11–12. Accordingly, the Court need not consider the Capitol Police's arguments on this score.

2. *Opposition Clause*

The Capitol Police also moves to dismiss Dodson's retaliation claim on the ground that he did not adequately allege that he engaged in protected activity under the opposition clause. Dkt. 13-1 at 19–21. The Capitol Police contends that Dodson's complaint only makes a series of conclusory allegations that he was engaging in protected activity during various conversations with supervisors about the events that led his dismissal. Dkt. 13-1 at 14 (citing Compl. ¶¶ 57–

8

59). But, his claim for retaliation incorporates by reference the preceding factual allegations, which include the allegation that Dodson "*regularly* spoke out about the Department treating him less favorably than his Caucasian colleagues." Dkt. 1 at 3 (Compl. ¶ 15) (emphasis added). That allegation, when combined with Dodson's allegations that he asked his supervisors "why he was being required to work additional duty" when others were not, *id.* at 4–5 (Compl. ¶ 22), and that he "questioned Sergeant Brown as to why he would not accept his doctor's note in accordance with past practice and when he asked Sergeant Brown how to properly document his sick leave," *id.* at 8 (Compl. ¶ 51), is sufficient to permit the inference that he complained of racially disparate treatment to his supervisors. *Cf. M.K. v. Tenet*, 99 F. Supp. 2d 12, 33 (D.D.C. 2000) (finding an allegation of a general pattern of conduct sufficient to permit the inference that that conduct occurred on specific occasions for purposes of a motion to dismiss).

Accordingly, the Court rejects the Capitol Police's challenge on this basis.

**D.     Due Process**

Finally, the Capitol Police moves to dismiss Plaintiff's claim that his termination violated his procedural due process rights secured by the Fifth Amendment. To prevail on his procedural due process claim, the plaintiff must first show a deprivation of "life, liberty, or property" and must then show that "the procedures used by the Government in effecting the deprivation [did not] 'comport with due process of law.'" *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).

The Capitol Police first contend that Dodson's termination did not deprive him of a cognizable property interest. Public employees who may only be fired for cause have a property interest in their employment. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–38

(1985). The Capitol Police thus argue that, by signing the last chance agreement, Dodson was no longer an employee subject to termination only for cause and that, as a result, he did not have a cognizable property interest in his employment. Dkt. 13-1 at 19–20. But, crediting the allegations of the complaint as true, as the Court must at this stage of the proceeding, the last chance agreement did not permit the Capitol Police to terminate Dodson without cause. Rather, as excerpted in the complaint, it permits his termination only *after* a predicate finding of a disciplinary violation—in other words, only for cause. Dkt. 1 at 3–4 (Compl. ¶ 17). Thus, the Capitol Police's argument that the last chance agreement transformed Dodson into an at-will employee, stripping him of his property interest in his employment, cannot be sustained on the present record. *See Devorah v. Royal Bank of Canada*, 115 F. Supp. 3d 35, 38 (D.D.C. 2015) ("The court must accept all non-conclusory allegations of fact contained in a complaint and draw all reasonable inferences in favor of the plaintiff" in deciding a motion to dismiss). At a minimum, the Court would need to review the entire agreement to determine what rights Dodson waived, and what rights, if any, he preserved.

       The Capitol Police further argues that, even if Dodson maintains a property interest in his employment, his claim nevertheless fails because he received constitutionally adequate process. In evaluating whether governmental procedures meet the constitutional minimum set by the due process clause, the Court must consider (1) the private interest; (2) "the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) the governmental interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The Capitol Police contend that Dodson received adequate process because he received notice of the reasons for his termination, and he had the chance to "present[] additional information that he believed was relevant" to the Chief of Police. Dkt. 13-1

at 21 (citing Dkt. 1 at 6 (Compl. ¶¶ 18–20, 36)). But Dodson alleges that he was denied a hearing or formal appeal procedures. Dkt. 1 at 6 (Compl. ¶ 35). And, importantly, he seeks additional process regarding the issuance of the disciplinary citation, not the decision to recommend termination as a result of that disciplinary citation—a recommendation he cannot appeal under the Last Chance Agreement. Nor does the allegation that he "presented additional information" to the Chief of Police who "rejected it," *id.* at 6 (Compl. ¶ 36), mean that he received an opportunity to be heard; that phrasing is equally consistent with declining to consider that information at all.

Accordingly, taking Dodson's allegations to be true, and drawing all inferences in his favor at this early stage of the proceeding, the Court concludes his procedural due process claim is sufficient to survive a motion to dismiss. The Capitol Police may have grounds to challenge the claim on a more complete record. But for present purposes, the Court must deny Defendant's motion to dismiss.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss, Dkt. 13, is hereby **DENIED**.

**SO ORDERED**.

    /s/ Randolph D. Moss
    RANDOLPH D. MOSS
    United States District Judge

Date: September 30, 2019