**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ARREN DODSON,

        *Plaintiff*,

    v.

UNITED STATES CAPITOL POLICE,

    *Defendant*.

Civil Action No. 18-2680 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Arren Dodson brings this action against Defendant United States Capitol Police ("the USCP" or "the Department") pursuant to the Congressional Accountability Act ("CAA"), 2 U.S.C. § 1301 *et seq.*, which requires various legislative branch agencies to comply with Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See* 2 U.S.C. § 1302. Dodson alleges that the Department discriminated against him on the basis of his race (Count I), disciplined him in retaliation for speaking out against racial discrimination (Count II), and disciplined (and ultimately terminated) him without procedural due process (Count III). Dkt. 1 at 7–9 (Compl. ¶¶ 42, 48, 57). Defendant moves for summary judgment as to all three counts, Dkt. 42, and Plaintiff cross-moves for summary judgment as to Count III, Dkt. 54. For the following reasons, Defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part and Plaintiff's partial cross-motion for summary judgment is **DENIED**.

## I.  BACKGROUND

For purposes of resolving the cross-motions for summary judgment, the Court takes "the facts in the record and all reasonable inferences derived therefrom in a light most favorable" to

the non-moving party. *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017) (quoting *Al-Saffy v. Vilsack*, 827 F.3d 85, 89 (D.C. Cir. 2016)).

Pursuant to Local Civil Rule 7(h)(1), the USCP has provided a statement of material facts as to which they contend there is no genuine dispute, *see* Dkt. 42-2 (Def.'s SUMF), and Dodson has responded, to some extent, *see* Dkt. 53-2 (Pl.'s SOF). The Court notes that Plaintiff's responses as to Counts I and II purport to dispute a large number of the USCP's undisputed material facts. Dkt. 53-2. But rather than set forth a "*concise* statement of genuine issues setting forth" those "issue[s] necessary to be litigated," L. Civ. R. 7(h)(1) (emphasis added), Plaintiff frequently uses his responses to *supplement* Defendant's statement of facts in lengthy form, rather than to contest the validity thereof, *see, e.g.*, Dkt. 53-2 at 10–11 (Pl.'s SOF ¶ 35). This approach does not accord with the procedures outlined in Local Rule 7(h)(1), which "places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Walker v. District of Columbia*, 279 F. Supp. 3d 246, 253 (D.D.C. 2017) (quoting *Jackson v. Finnegan*, 101 F.3d 145, 151 (D.C. Cir. 1996)). Accordingly, to the extent that Plaintiff labels certain facts as "disputed" but does not directly respond to the material facts in Defendant's statement (or does so without reference to specific portions of the record), the Court considers those facts admitted for purposes of resolving the instant motion. *See* Fed. R. Civ. P. 56(e) (indicating that a court can "consider [a] fact undisputed for purposes of the motion" where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact"). Where factual assertions are genuinely disputed, however, the Court views the evidence in the light most favorable to the non-moving party. *See Coleman*, 867 F.3d at 209.

A.    **Factual Background**

1.    *Dodson's Employment History with the USCP*

Plaintiff Arren Dodson was an officer in the Uniformed Services Bureau of the USCP for

eleven years, beginning on January 19, 2007.  Dkt. 42-2 at 1, 4 (Def.'s SUMF ¶¶ 3, 23–24).

Throughout his tenure, Dodson was assigned, at various points, to the House office buildings

("the House Division"), the Senate office buildings ("the Senate Division"), and to the United

States Capitol ("the Capitol Division").  *Id.* at 4 (Def.'s SUMF ¶¶ 24–25).  Between 2009 and

2017, Dodson received a series of performance reviews indicating that he had "me[t]

expectations," *see, e.g.*, Dkt. 53-12 at 2, 10, 18, 28, 36, 44, 70 (Pl.'s Ex. 10), and that he had, at

times, exceeded expectations as to some of his core competencies, *see, e.g.*, *id.* at 4, 7, 12.

Dodson also received several letters of appreciation from USCP management throughout his

tenure, including for his musical performance at ceremonies, Dkt. 53-32 at 2, 4 (Pl.'s Ex. 30); for

his outstanding attendance record during the 2007 calendar year, *id.* at 3; for his service at a

contentious committee hearing in June 2010 and at the January 2017 presidential inauguration,

*id.* at 5–6; and for his efforts to locate suspects during critical incidents in February and

December 2017, *id.* at 7–8.

But Dodson was also disciplined by Department leadership several times throughout his

tenure.  USCP officers are given notice of proposed disciplinary action through the form of CP-

534s (for "Command Discipline") and CP-535s (for "Department Discipline"), each of which

officers can contest or appeal through procedures set out in the USCP Collective Bargaining

Agreement ("CBA").  Dkt. 53-10 at 3–4 (Pl.'s Ex. 8).  CP-534s typically recommend a written

warning or a time-limited loss of time or pay, while CP-535s typically recommend forfeitures of

time or salary, demotion, or removal from the USCP altogether.  *Id.* at 3.  The CBA provides that

officers can appeal CP-534s to the Chief of Police or file grievances as to those CP-534s that include a proposed loss of time or pay. *Id.* Officers can contest CP-535s with the Assistant Chief of Police and can appeal the Assistant Chief's written decision to the Chief of Police or file a grievance. *Id.* Officers receiving CP-535s that propose demotion, removal, or forfeiture of more than fourteen days of time or pay, moreover, have the option of requesting a hearing through the Disciplinary Review Board ("DRB") before appealing the DRB's decision to the Chief of Police or filing a grievance. *Id.*

In March 2012, a USCP investigation concluded that Officer Dodson had violated Department rules governing "Use of Alcohol" when he purportedly "consumed alcohol to the point that he was unable to report for his scheduled tour of duty" on August 11, 2011. Dkt. 42-4 at 130 (Def.'s Ex. 2). Dodson was also charged with a violation of the rules governing "Abuse of Process" five days later, when he allegedly "submitted a falsified medical certification to the Department in connection with his August 11–12, 2011 absence from work." *Id.* at 133. Dodson unsuccessfully appealed the CP-535s associated with both incidents to Deputy Chief Donald Rouiller, *see* Dkt. 53-13 at 2–4 (Pl.'s Ex. 11), and ultimately received five- and seven-day unpaid suspensions for the use-of-alcohol and abuse-of-process violations, respectively, Dkt. 42-2 at 4–5 (Def.'s SUMF ¶¶ 30, 34).[1]

Dodson received another CP-535 in July 2012 for "conduct unbecoming" based on an allegation that he, "while off-duty and in a local nightclub, . . . became involved in a physical

---

[1] Here, as with several of the disciplinary reports described in this section, Dodson disputes USCP's description of this incident on the grounds that neither the relevant Disciplinary Review Officer nor the Chief of Police, who reviewed the disciplinary action on appeal, considered mitigating factors (or other additional context) in issuing this discipline. *See* Dkt. 53-2 at 8–10 (Pl.'s SOF ¶¶ 30–33); *see also id.* at 10–14 (Pl.'s SOF ¶¶ 33–40). Dodson does not, however, dispute his receipt of the CP-535s or the fact of his suspensions. *Id.*

altercation and struck a bar patron 4[ to ]6 times with a bottle." Dkt. 42-4 at 127 (Def.'s Ex. 2).

After an unsuccessful appeal to then-Assistant Chief of Police Matthew Verderosa, Plaintiff

received another five-day unpaid suspension. *See id.* at 128; Dkt. 42-2 at 5 (Def.'s SUMF ¶ 36);

Dkt. 53-2 at 12–13 (Pl.'s SOF ¶ 36).

In February 2016, Dodson was charged with "Improper Remarks" and "Unsatisfactory

Performance" in what ultimately became OPR Case No. 15-122. Dkt. 42-2 at 5 (Def.'s SUMF ¶

37). An investigation by the USCP's Office of Professional Responsibility ("OPR") concluded

that Dodson "responded to a fellow officer's question . . . with inappropriate language,

questioning who she was, using profanity, and referring to another officer as the 'white boy.'"

Dkt. 42-4 at 136 (Def.'s Ex. 2); *see also* Dkt. 42-2 at 5 (Def.'s SUMF ¶ 38). OPR further

"determined that Officer Arren Dodson violated . . . [the rule governing] Unsatisfactory

Performance" by having a "'written record of repeated infractions of the rules, regulations,

Directives and orders of the Department' as well as 'repeated sustained complaints of

misconduct.'" Dkt. 42-4 at 136 (Def.'s Ex. 2). Plaintiff received a CP-535 recommending a

five-day unpaid suspension in connection with the improper-remarks violation, Dkt. 42-2 at 5

(Def.'s SUMF ¶ 39), and a CP-535 recommending a "termination of [his] employment in

connection with" the unsatisfactory performance violation, Dkt. 42-4 at 136–37 (Def.'s Ex. 2).

In lieu of termination, however, Dodson and the USCP executed a Last Chance

Agreement ("LCA"), *see* Dkt. 53-36 at 43 (Pl.'s Ex. 34), which provided Dodson "with a final

opportunity to demonstrate, on a continuing basis, satisfactory performance," Dkt. 42-2 at 6

(Def.'s SUMF ¶ 44); Dkt. 42-4 at 139 (Def.'s Ex. 2). Dodson, who was represented by Union

counsel at the time, Dkt. 42-2 at 6 (Def.'s SUMF ¶ 42), agreed in the LCA "to serve a 5-day

suspension without pay for the Improper Remarks charge" and "to refrain from further

misconduct in the workplace."  Dkt. 42-4 at 139 (Def.'s Ex. 2).  The LCA further provided that:

> [A]ny future sustained CP-535 discipline approved by the Chief of Police or his
> designee which results in a suspension without pay during a five (5) year period
> from the date of this LCA, will result in termination of his employment for the
> prior misconduct sustained in OPR Case No. 15-122, as a violation of this LCA.

*Id.*  The LCA indicated, moreover, that:

> In exchange for this LCA and in order to demonstrate his intent to follow the
> Department's Rules of Conduct, Officer Dodson voluntarily and knowingly
> agrees to waive any and all rights in accordance with the Congressional
> Accountability Act, Department orders, policies and/or directives to
> appeal/grieve, litigate, or in any way challenge the results of OPR Case No.
> 15-122, this LCA, or any future action taken by the Department as a result of
> his violation of the terms of the LCA.

*Id.*

## 2.  *Dodson's Transfer to SD1*

Following the execution of the LCA, Dodson was assigned to Section One of the Senate

Division ("SD1"), where he worked the so-called "midnight shift" in the Senate Building from

10:30 p.m. until 6:30 a.m.  Dkt. 42-2 at 7, 9, 13 (Def.'s SUMF ¶¶ 48, 67, 93, 95–97).  Dodson's

tour of duty spanned from Wednesday to Sunday every week; Monday and Tuesday were his

"excused day[s] off."  *Id.* at 20 (Def.'s SUMF ¶¶ 144–47).  During Dodson's tenure in SD1,

Inspector Jeffrey Pickett was the commander of the Senate Division and Richard Bodziony was

the SD1 commander.  *Id.* at 7, 11 (Def.'s SUMF ¶¶ 49, 77).  Sergeants Jason Brown, Charles

Davis, and Deforest Fleming reported to Bodziony.  *Id.* (Def.'s SUMF ¶ 50).

Officers from Section Two of the Senate Division ("SD2") begin their shifts at 6:30 a.m.,

following the end of SD1 officers' tours of duty.  *Id.* at 9, 13 (Def.'s SUMF ¶¶ 67–68, 95–97).

But because SD2 has more posts than SD1 and must, at all times, be "fully staffed," SD1 officers

are, on occasion, required to stay on for the SD2 shifts immediately following their SD1 shift.

*Id.* The CBA, accordingly, requires officers to participate in "unscheduled additional duty" when a "manpower need" arises "during [an officer's] current tour, for the upcoming tour." *Id.* at 8 (Def.'s SUMF ¶ 59); Dkt. 42-4 at 66 (Def.'s Ex. 2).

To assist in assigning SD1 officers to additional duty for an upcoming SD2 shift, SD1 sergeants maintain an "unscheduled draft list" in order of inverse seniority. Dkt. 42-2 at 8 (Def.'s SUMF ¶ 57). Officers on the unscheduled draft list are ineligible for additional duty, however, if they (i) "already worked sixteen (16) hours in that twenty-four (24) hour period;" (ii) "ha[ve] Department training or another Department meeting during the following SD2 shift;" (iii) are "already working the following SD2 shift;" or (iv) were "not working the SD1 shift at the time of the draft." *Id.* at 10 (Def.'s SUMF ¶ 74). The CBA provides that, when an officer seeks unscheduled sick leave for an upcoming shift, he must "personally notify and speak directly to a supervisor of the officer's Unit/Division, at least one (1) hour prior to the beginning of the officer's tour of duty." Dkt. 42-4 at 68 (Def.'s Ex. 2). Multiple white officers, however, have averred during the course of this litigation that they and other white colleagues were, at times, permitted to refuse additional duty without consequence, even without requesting unscheduled sick leave. Dkt. 53-6 at 3 (Pl.'s Ex. 4) (Detorie Decl. ¶¶ 8–9); Dkt. 53-5 at 3 (Pl.'s Ex. 3) (Myers Decl. ¶ 10).

As early as 2010, when Dodson served his first tour of duty in the Senate Division, Dodson asked his supervisors why Black USCP officers were drafted more frequently for overtime and had a harder time "swap[ping] out their shifts" than their white colleagues. Dkt. 48 at 43 (Def.'s Ex. 3) (Dodson Dep.); Dkt. 53-2 at 112 (Pl.'s SOF ¶ 413). He was told "to be quiet or [he] would be in trouble." Dkt. 48 at 33 (Def.'s Ex. 3) (Dodson Dep.). When he returned to SD1 six years later, after the execution of his LCA, the same problems were evident: Dodson

asked SD2 Sergeant Green why he "was being drafted [by Bodziony and Brown for duty] more

often than white officers;" she responded that "that's how they work." *Id.* at 238–39.

Dodson was also subject to what he describes as "excessive and harassing supervision"

from his SD1 supervisors. Dkt. 53-2 at 109 (Pl.'s SOF ¶ 387); *see* Dkt. 48 at 56–57 (Def.'s Ex.

3) (Dodson Dep.). Brown and Bodziony frequently "check[ed] [up] on [Dodson]" during his

shift, Dkt. 53-2 at 109 (Pl.'s SOF ¶ 390); Bodziony questioned Dodson about his facial hair

notwithstanding his shaving waiver, Dkt. 48 at 207 (Def.'s Ex. 3) (Dodson Dep.); and Brown and

Bodziony complained to Dodson about the amount of sick leave he was taking and the leave

remaining in his "bank," Dkt. 53-2 at 110 (Pl.'s SOF 397); Dkt. 48 at 209 (Def.'s Ex. 3) (Dodson

Dep.). At some point between his transfer to SD1 in 2016 and his termination in 2018, Dodson

spoke to Fleming about "why [he] was . . . being singled out on this division;" Fleming

responded that Dodson should "just do what [he's] supposed to do," not "give [Brown and

Bodziony] a reason to . . . harass [him]," and "be extra diligent." *Id.* at 212.

3. *January 17, 2018*

On January 16, 2018, Dodson reported for his regularly scheduled SD1 shift at

approximately 10:30 p.m. Dkt. 42-2 at 14 (Def.'s SUMF ¶ 96). The SD1 schedule for the

shift—which was labeled the "January 17 shift" based on to the shift's end date, *id.* at 13 (Def.'s

SUMF ¶ 93)—listed four officers, not including Dodson, who were first up on the "unscheduled

draft list" for any unfilled SD2 slots the next day, *id.* (Def.'s SUMF ¶ 94), but it "also listed

every SD1 officer," including Dodson, "who was working the SD1 shift on that day, *id.* (Def.'s

SUMF ¶ 95). Dodson testified that he was feeling sick before he arrived at work and that his

symptoms worsened throughout his shift. Dkt. 48 at 157 (Def.'s Ex. 3) (Dodson Dep.). By 3:00

or 4:00 a.m., Dodson encountered Sergeant Davis and told him that he had "a mad headache and

[that his] ears [were] hurting." *Id.* at 158.  Davis responded that Dodson should "try to stay out of the cold." *Id.*

At around 6:35 a.m. on January 17, 2018, SD2 Sergeant Green notified Sergeant Davis that she would need an additional officer for the SD2 shift.  Dkt. 42-2 at 29 (Def.'s SUMF ¶ 97).  Sergeant Brown reviewed the unscheduled draft list and determined that the first six officers listed were ineligible to work.  *Id.* at 14–15 (Def.'s SUMF ¶¶ 98–107).  Three officers were already scheduled to work the SD2 shift, *id.* (Def.'s SUMF ¶¶ 99, 102, 104), and another officer had been initially drafted to fill a different vacant SD2 slot but was excused after invoking leave pursuant to the Family Medical Leave Act ("FMLA"), *id.* at 14 (Def.'s SUMF ¶ 101).  The remaining two officers were not working on January 17 and were thus ineligible for the unscheduled emergency draft.  *Id.* (Def.'s SUMF ¶¶ 100, 103).  Officer 7, the next eligible officer, had the last break of the January 17 SD1 shift and was exercising at the gym when he was called about working the SD2 shift.  Dkt. 42-6 at 7 (Def.'s Ex. 4) (Brown Decl. ¶ 36); Dkt. 42-2 at 15 (Def.'s SUMF ¶¶ 105–106); Dkt. 48 at 413 (Def.'s Ex. 3) (Bodziony Dep.).  He invoked leave pursuant to the FMLA and was excused.  Dkt. 42-6 at 7 (Def.'s Ex. 4) (Brown Decl. ¶ 36).

At approximately 6:40 a.m. that morning, Sergeant Davis contacted Dodson and informed him that he would be held over for an additional SD2 shift.  Dkt. 42-9 at 17 (Def.'s Ex. 7); Dkt. 42-2 at 15 (Def.'s SUMF ¶¶ 109–10).  Dodson responded that he was sick and unable to stay, at which point Davis directed Dodson to speak with Lieutenant Bodziony.  *Id.* (Def.'s SUMF ¶ 111).  Dodson told Bodziony that he "was ill," "had a migraine" and "what felt like an ear infection," and that he "needed to go to the doctor to get it taken care of."  Dkt. 48 at 120 (Def.'s Ex. 3) (Dodson Dep.).  Bodziony replied that Dodson would be required to work

notwithstanding any illness and that he "did not care that [Dodson] was sick." *Id.* at 120–21.

According to Dodson, Bodziony confirmed that Dodson was ordered to work even after Dodson

had informed Bodziony that he was "unfit for duty because of an illness." *Id.* at 153.  Dodson

asked Bodziony to "put [that] in writing so that [he] could give it to [his] lawyers." *Id.*

Bodziony walked away, *id.* at 121, 153, and Dodson "changed clothes and clocked out," *id.* at

121.  The Department's "unscheduled sick book" indicates that Dodson was marked as "AWOL"

at 6:50 a.m. on January 17, 2018, and that he was placed on sick leave later that day, around 8:00

p.m. Dkt. 42-9 at 13 (Def.'s Ex. 7); *see* Dkt. 48 at 669 (Def.'s Ex. 3) (Fleming Dep.) (identifying

this exhibit as the "unscheduled sick book").[2]

Dodson went to the doctor on January 19, 2018.  Dkt. 42-2 at 16 (Def.'s SUMF ¶ 120);

Dkt. 42-9 at 18 (Def.'s Ex. 7).  At that time, he received a note that stated: "This patient was seen

today at the Medstar Promptcare Capitol Hill Clinic.  Please excuse from work for the following

dates[] 1/19/2018." Dkt. 42-9 at 18 (Def.'s Ex. 7).  Dodson testified, moreover, that the doctor

prescribed him, at his appointment, a seven- to ten-day course of antibiotics and told him that he

should see his primary care physician if he did not feel better after the full course.  Dkt. 48 at

127–28 (Def.'s Ex. 3) (Dodson Dep.).

Bodziony assigned Sergeant Fleming the task of investigating Dodson's refusal to work

the January 17 SD2 shift.  Dkt. 42-2 at 21 (Def.'s SUMF ¶ 153); Dkt. 42-9 at 4 (Def.'s Ex. 7)

(Fleming Decl. ¶ 17).  As part of the investigation, Fleming interviewed several of Dodson's

supervisors and Dodson himself, who was represented by the union at the time.  Dkt. 42-9 at 7

---

[2] Dodson's Statement of Facts indicates that Dodson called the Senate Division around 8:00 p.m. to request this unscheduled sick leave, Dkt. 53-2 at 42 (Pl.'s SOF ¶ 149), but the record does not reflect the fact of his call—it reflects only the notation of "S/L" in the sick book around 8:00 p.m. on January 17, 2018.  Dkt. 42-9 at 13 (Def.'s Ex. 7).

(Def.'s Ex. 7); Dkt. 42-2 at 22 (Def.'s SUMF ¶ 162).  Based on the materials in the record, Dodson seems to have agreed during the interview that he had been ordered to stay for an unscheduled shift and that he declined to do so after telling "Lt. Bodziony and Sgt. Davis [that] [he] was sick and had a migraine and an ear infection." *Id.* at 19.  Fleming completed the investigation and the resulting Report of Investigation ("ROI") on February 7, 2018, *id.* at 7, which "sustained" the allegations that Dodson had violated the USCP Rules of Conduct governing "Absence from Duty" and "Insubordination" when he refused to work the unscheduled SD2 shift, *id.* at 10.  The absence-from-duty rule considers "[e]mployees who fail to appear for duty at the date, time, and place specified without consent of a supervisor" as "Absent without Leave," ("AWOL"), Dkt. 42-4 at 15 (Def.'s Ex. 2); the insubordination rule forbids employees from "refus[ing] to obey, by words or actions, any lawful order of a supervisor [or] . . . utter[ing] any disrespectful, rebellious, insolent, or abusive language to or toward a supervisor," *id*.  Fleming's ROI was signed by Bodziony and Senate Division Three ("SD3") captain Eric Keenan, who concurred in the recommendation, and it was approved by Senate Division Commander Jeffrey Pickett.  Dkt. 42-9 at 11 (Def.'s Ex. 7).  The Senate Division subsequently forwarded the ROI to OPR for review and determination of whether the charges should be sustained.  Dkt. 42-2 at 22 (Def.'s SUMF ¶ 168); *see also id.* at 12 (Def.'s SUMF ¶¶ 85–86).

4.  *January 19–21, 2018*

On January 19, 2018, when Dodson was on sick leave, then-Chief of Police Verderosa authored a memorandum, which he instructed should "be read at all roll calls and posted on all bulletin boards," that warned officers of an impending government shutdown.  Dkt. 42-4 at 142 (Def.'s Ex. 2).  The memorandum provided, in relevant part, that "[e]xcepted employees are

expected to report for duty in accordance with their basic work schedule unless instructed otherwise," *id.* at 145; that "failure to report for duty as required . . . can result in disciplinary action according to established Department rules," *id.* at 147; that employees "cannot be in a paid leave status" during the shutdown; and that "[a]ny excepted employees who cannot be at work must be temporarily furloughed for the period of the employee's absence from duty," *id.* at 149. It further indicated that "any absence from work during a shutdown must be supported by medical documentation (for sick leave)" and that "[u]napproved absences, or absences that are not supported by documentation, will be considered AWOL." *Id.*

Notwithstanding Verderosa's memorandum, Dodson and several of his fellow SD1 officers attest that they were unaware that officers were not allowed to take leave during a government shutdown. *See* Dkt. 48 at 185–86 (Def.'s Ex. 3) (Dodson Dep.); *see* Dkt. 53-7 at 4 (Pl.'s Ex. 5) (Nicholas Decl. ¶ 12); Dkt. 53-5 at 4 (Pl.'s Ex. 3) (Myers Decl. ¶ 15). Dodson and his colleagues arguably were not alone in their confusion about the leave policies outlined in Verderosa's memorandum: Captain Kenneth Wheeler notified Department leadership shortly after the memorandum was issued that officers were interpreting it to mean that they would "hav[e] the choice to be off and temporarily furloughed." Dkt. 53-24 at 3 (Pl.'s Ex. 22); *see also* Dkt. 53-25 at 2 (Pl.'s Ex. 23). "[B]asically," he explained, the officers "are rolling the dice on whether they will be paid when the Government is funded." Dkt. 53-24 at 3 (Pl.'s Ex. 22). Pickett clarified, in response to the internal email, that officers "MAY NOT self[-]furlough!" *Id.*

Beginning at 12:00 a.m. on Saturday, January 20, 2018, the federal government shut down. Dkt. 42-2 at 18 (Def.'s SUMF ¶ 131). Although Dodson's tour of duty included Saturdays and Sundays, he did not report to work on either Saturday, January 20 or on Sunday, January 21, 2018. *Id.* at 20 (Def.'s SUMF ¶ 147). Dodson did not return to work until the

beginning of his January 24 shift (which, presumably, began on January 23 at 10:30 p.m., *id.* at 14 (Def.'s SUMF ¶ 96)), after his Saturday and Sunday absence and his regularly scheduled "excused day[s] off" on Monday and Tuesday. *Id.* (Def.'s SUMF ¶¶ 144, 148); Dkt. 53-2 at 41 (Pl.'s SOF ¶ 148).

Once the government shutdown concluded, SD3 Captain Eric Keenan indicated that the Department would "complete an ROI on each officer who did not report to work during the furlough." Dkt. 53-30 at 3 (Pl.'s Ex. 28). He indicated that, "[i]f they have qualified documentation then that will be an exhibit in the ROI and possibly reason for exoneration." *Id.* If, however, "their documentation [was] nonexistent or somehow lacking in a sufficient reason to miss work, then they will be charged with absence from duty (AWOL)." *Id.* Assistant Chief of Police Steven Sund, moreover, instructed the division commanders to "make sure that anyone returning from a furlough due to an allegation of being sick provide[s] a doctor[']s note indicating they are able to return." Dkt. 53-31 at 3 (Pl.'s Ex 29). At Bodziony's instruction, Sergeant Brown investigated Dodson's absence during the shutdown. Dkt. 42-2 at 22 (Def.'s SUMF ¶¶ 169–70); *see also* Dkt. 53-30 at 2 (Pl.'s Ex. 28).

As part of his investigation, Brown interviewed Dodson, Dkt. 42-6 at 8 (Def.'s Ex. 4) (Brown Decl. ¶ 52), who indicated that he had not received notice of leave cancellation from his supervisors and that he had been, throughout January 20 and 21, still suffering from an ear infection, Dkt. 42-6 at 25–26. Dodson gave Brown the January 19 note from his physician, but Brown requested that Dodson provide a note excusing him, specifically, for January 20 and 21. Dkt. 48 at 174 (Def.'s Ex. 3) (Dodson Dep.); Dkt. 42-2 at 23 (Def.'s SUMF ¶ 177). MedStar Health, however, was unable retroactively to provide Dodson with such a note. Dkt. 48 at 130–31, 147, 187 (Def.'s Ex. 3) (Dodson Dep.). Instead, MedStar gave Dodson a second note, dated

February 28, 2018, which added to his first note only that Dodson should "follow up with [his]

primary care doctor." Dkt. 42-6 at 37 (Def.'s Ex. 4); Dkt. 42-2 at 24 (Def.'s SOF ¶ 180). When

Brown indicated that Dodson's second note "says just about the same thing the first one did" and

that he was still "hoping to get a note saying that [Dodson] [was] excused from work on 1-20-18

and 1-21-18," Dkt. 42-6 at 39 (Def.'s Ex. 4), Dodson replied that he was "completely unclear on

what information the Department requires in a doctor's note" and asked Brown to send him "a

copy of the relevant order that provides guidance on the precise contents of a doctor's note," *id.*

at 38. Brown did not do so, but he continued to insist that Dodson submit a note excusing him

from work on January 20 and 21. *Id.* Dodson responded that he "wasn't well and [that] the

doctor prescribed [him] medication and directed [him to] self[-]monitor." *Id.* Brown's ROI, to

which Bodziony concurred, *id.* at 28, ultimately "sustained" Dodson's violation of the USCP

Rule of Conduct governing "Absence from Duty," *id.* at 27. The ROI was subsequently

forwarded to OPR for review. Dkt. 42-2 at 26 (Def.'s SUMF ¶ 191).

      5.   *OPR Review and Discipline*

      On April 10, 2018, OPR combined the investigations of Dodson's two January 2018

absences into a single OPR case, number 18-018, which charged him with "unsatisfactory

performance" and "insubordination." Dkt. 42-4 at 156 (Def.'s Ex. 2). Upon consideration of

Dodson's refusal to work the SD2 shift on January 17, his failure to report for duty on January

20 and 21, and his extensive disciplinary history, OPR's ROI "sustained" the allegation that

Dodson violated the USCP's Rule of Conduct governing "Unsatisfactory Performance," which

requires USCP employees to "maintain sufficient competency to properly perform their duties

and assume the responsibilities of their position" and to "perform their duties in a manner which

will maintain the highest standards of efficiency and integrity in carrying out the functions and

objectives of the Department." *Id.* at 160; *see also id.* at 15.  OPR further "sustained" the insubordination charge as to Dodson's refusal to work the January 17 SD2 shift after being ordered to do so.  *Id.* at 161.  OPR requested that USCP's Disciplinary Review Officer ("DRO") issue a penalty recommendation as to each violation.  Dkt. 42-2 at 27 (Def.'s SUMF ¶ 196).

Scharon Ball, the DRO, reviewed the ROI.  *Id.* at 28 (Def.'s SUMF ¶ 198).  Under the USCP's CBA, disciplinary review officers must consider four factors in determining an appropriate penalty for an officer: (1) the nature and seriousness of the offense; (2) the employee's record; (3) penalties imposed on other employees for the same or similar offenses; and (4) any mitigating circumstances in the case.  *Id.* at 27–28 (Def.'s SUMF ¶ 197).  At the conclusion of her review, Ball recommended that Dodson "receive a CP-535 and a 2-day suspension without pay in connection with the sustained violation of [the] USCP Directive . . . [on] Insubordination," and "a CP-535 with a recommendation for termination of his USCP employment in connection with the sustained violation of [the] USCP Directive . . . [on] Unsatisfactory Performance."  Dkt. 42-11 at 13 (Def.'s Ex. 9) (emphasis omitted).

Ball forwarded her report to then-Deputy Chief Richard Rudd, who approved the recommended penalties.  Dkt. 42-2 at 31 (Def.'s SUMF ¶¶ 215–16).  Rudd was charged with informing Dodson of the CP-535s against him—apparently, in the first instance, at an April 30, 2018 meeting with Dodson.  Dkt. 42-12 at 10 (Def.'s Ex. 10).  That day, Rudd issued Dodson a memorandum "to memorialize [their] meeting," serving Dodson with what Rudd described as "two CP-535s [i.e., requests for disciplinary action] in connection with sustained violations" of USCP directives.  *Id.*; *see also* Dkt. 42-2 at 31 (Def.'s SUMF ¶¶ 217–18).  The memorandum also indicated:

> As you know, under the terms of the June 28, 2016 Last Chance Agreement . . .
> your receipt of any sustained CP-535 discipline is a violation of the LCA that

> will result in the termination of your employment, and you are not entitled to an
> appeal, grievance or any other challenge of the recommended termination.
> Within the coming days, the Chief of Police and/or his designee will review the
> sustained charges and recommended CP-535 discipline in this case.  Should the
> Chief of Police or his designee concur, a recommendation for termination of
> your USCP employment will be forwarded to the Capitol Police Board for
> approval.

Dkt. 42-12 at 10 (Def.'s Ex. 10).  The two CP-535s were attached to Rudd's memorandum.  *Id.*

at 12–15.

Five days later, on May 4, 2018, Dodson's union counsel, Megan Mechak, submitted a

letter to then-Chief Verderosa with the subject line, "Presentation of Information re: Case No.

OPR-18-018/18-005."  Dkt. 42-3 at 9, 12 (Def.'s Ex. 1).  That letter raised a series of concerns

about the process afforded to Dodson.  For one thing, Mechak stated that, "[a]side from the

information contained in the two [CP-535s], Deputy Chief Rudd did not provide . . . Dodson

with any other information relating to the Department's investigation into the allegations of

misconduct against him, the evidence used to determine he engaged in misconduct, or the

information that would be provided to you for consideration of the allegations."  *Id.* at 9.

Counsel also argued that "[t]he CP-535s issued to Officer Dodson ha[d] not been 'sustained,'

and w[ould] not be sustained until he . . . completed the disciplinary appeal/grievance process

described in Article 31 of the parties' [CBA]."  *Id.* at 10.  She explained that "[i]f Officer

Dodson is afforded the process to which he is entitled, he will be able to prove that he did not

engage in misconduct warranting *any* CP-535 discipline."  *Id.*  She further stressed Dodson's

disagreement with the statement of facts contained in the CP-535s, recounted Dodson's illness

on January 17, 2018, and noted that the Department failed to notify him of the government

shutdown.  *Id.* at 11.  As such, "[e]ven without the benefit of discovery or a hearing," the letter

noted, "the information provided by Officer Dodson demonstrates that his employment should

not be terminated."  *Id.* at 12.

Chief Verderosa responded to the letter five days later, on May 9, 2018. *Id.* at 14, 16. He indicated that he had reviewed Mechak's letter, as well as the ROI and evidence related to OPR Case Nos. 18-018/18-005 and Officer Dodson's executed LCA from June 28, 2016. *Id.* After recounting the charges against Dodson and the factual context underlying the CP-535s, he "concluded that both charges are properly sustained and result in suspension without pay" and that "Officer Dodson has [therefore] violated the terms of his LCA," which provided for termination if "he had further acts of misconduct resulting in a CP-535 with suspension without pay." *Id.* at 15. As to counsel's process objections, Chief Verderosa indicated that he "d[id] not agree" and pointed towards the waiver provision of Dodson's LCA, which provided that Dodson waived all rights to grieve the results of OPR Case No. 15-122 "or *any future action* taken by the Department as a result of his violation of the terms of this LCA." *Id.* (emphasis in original). Verderosa explained, instead, that he would "mov[e] forward with a recommendation of termination of employment for [Dodson's] misconduct in OPR-15-122, for unsatisfactory performance." *Id.* He also provided Dodson with the option "to resign from the Department within five (5) business days of the date of this letter" and indicated that he would forward his recommendation to the Capitol Police Board for approval if Dodson did not resign. *Id.* at 16.

The USCP Chief is statutorily authorized to "discipline, discharge, and set the terms, conditions, and privileges of employment of employees of the Capitol Police." 2 U.S.C. § 1907(e)(1)(A). The Chief, however, "may terminate an officer . . . only after the Chief has provided notice of the termination to the Capitol Police Board," *id.* § 1907(e)(1)(B), a statutorily created entity comprised of the Sergeant [at] Arms of the House of Representatives, the Sergeant at Arms of the Senate, and the Architect of the Capitol, Dkt. 42-2 at 3 (Def.'s SUMF ¶ 15). If the Board approves the termination or fails to act on it within 30 days of receiving the Chief's

notice, "the Board shall be deemed to have approved the termination."  2 U.S.C. § 1907(e)(1)(B).

Pursuant to this procedure, Verderosa sent the termination recommendation to the Capitol Police

Board on June 18, 2018, detailing the basis for his recommendation to terminate Dodson's

employment.  Dkt. 42-3 at 18–20 (Def.'s Ex. 1).  The Board approved the termination, and

Dodson was notified on June 29, 2018 that his employment had been terminated effective June

26, 2018.  *Id.* at 22.

## B.    Procedural History

Following his termination, Dodson filed a request for counseling with the Congressional

Office of Compliance, alleging that the USCP violated Sections 201 and 207 of the

Congressional Accountability Act.  Dkt. 1-1 at 1.  The parties engaged in mediation pursuant to 2

U.S.C. § 1403, but they were unsuccessful in resolving the dispute, and mediation closed on

September 14, 2018.  Dkt. 1 at 2–3 (Compl. ¶ 8); Dkt. 42-2 at 38 (Def.'s SUMF ¶¶ 243–44).

Dodson filed suit in this Court on November 19, 2018, alleging that the USCP unlawfully

discriminated against him because of his race, in violation of 2 U.S.C. § 1311, *et seq.* (Count I),

Dkt. 1 at 7–8 (Compl. ¶¶ 41–46); retaliated against him after he questioned his unscheduled duty

assignment and Brown's decision not to accept his sick note (Count II), *id.* at 8–9 (Compl. ¶¶

47–54); and violated his constitutional due process rights when he was terminated "without

notice or opportunity to be heard" (Count III), *id.* at 9 (Compl. ¶¶ 55–61).  The USCP moved to

dismiss each of the Counts in Dodson's complaint for failure to state a claim, Dkt. 13, and the

Court denied that motion on September 30, 2019, Dkt. 18.

The USCP now moves for summary judgment as to all three counts, and Dodson cross-

moves as to Count III.

## II.  LEGAL STANDARD

Summary judgment is warranted if a party can "show[] that there is no genuine dispute as to any material fact and [that the party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it could affect the outcome of the litigation under governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.  "Likewise, in

19

ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *See Muslim Advocs. v. U.S. Dep't of Just.*, 833 F. Supp. 2d 92, 98 (D.D.C. 2011).

## III.  ANALYSIS

### A.    Disparate Treatment

Under the CAA, the House of Representatives, the Senate, and various agencies of the legislative branch, including the USCP, must comply with several specified federal laws, including Title VII.  *See* 2 U.S.C. §§ 1301(a)(3)(D), 1302(a)(2).  Title VII, in turn, makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In the instant suit, Dodson contends that the USCP discriminated against him on the basis of his race when "it disciplined him . . . for conduct that is not similarly disciplined when committed by his Caucasian colleagues."  Dkt. 1 at 7 (Compl. ¶¶ 44–45).[3]

---

[3] Although Dodson's complaint broadly alleges that the discriminatory conduct at issue "include[es]" his termination "for conduct that is not similarly disciplined when committed by . . . Caucasian" officers, Dkt. 1 at 7 (Compl. ¶ 45), his opposition to USCP's summary judgment motion focuses more narrowly on the April 2018 disciplinary decisions that triggered the termination provision of his LCA, and does not ask the Court to revisit the 2016 discipline that resulted in the LCA in the first instance.  *See* Dkt. 53-1 at 31–33.  That focus makes sense because a challenge to any prior discipline is untimely, *see Brady v. Livingood*, 456 F. Supp. 2d 1, 5 (D.D.C. 2006) (explaining that a covered employee must "commence an action under the CAA by requesting counseling not later than 180 days after the alleged discriminatory action"), and because Dodson waived, by the terms of his LCA, any CAA claims as to OPR Case No. 15-122, which resulted in the LCA, *see* Dkt. 42-1 at 44; Dkt. 53-36 at 43 (Pl.'s Ex. 34).  As the Court explains below, USCP invokes the LCA waiver to bar any challenge to the discipline and penalty recommendation in OPR Case No. 15-122, *see* Dkt. 42-1 at 44–45, but does not invoke the LCA as to the 2018 discipline at issue here.

Where a plaintiff, as here, lacks direct evidence of discriminatory decision-making, courts evaluate Title VII disparate treatment claims using the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113–14 (D.C. Cir. 2016); *see also Newton v. Off. of the Architect of the Capitol*, 905 F. Supp. 2d 88, 92 (D.D.C. 2012), *aff'd* 598 F. App'x 12 (D.C. Cir. 2015) (explaining that courts rely on "judicial interpretations of Title VII" when analyzing employment discrimination claims brought under the CAA).  Under that framework, the plaintiff must first establish a *prima facie* case of discrimination.  *Wheeler*, 812 F.3d at 1113.  To do so, he "must allege [that] []he is part of a protected class under Title VII, []he suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).  Once he makes out a *prima facie* case, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Wheeler*, 812 F.3d at 1114.  If the employer does so, the burden then shifts back to the plaintiff, who must demonstrate that the employer's stated reason for its actions was in fact pretext for unlawful discrimination.  *Walker*, 798 F.3d at 1092.

Where the defendant has offered a legitimate, nondiscriminatory reason for the adverse employment action, however, a district court "need not—and *should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  The question of "whether the employee actually made out a prima facie case . . . disappear[s] and drops out of the picture," *id.* (alteration in original) (internal quotation marks omitted), and the Court must "skip ahead to the third step in the test," *Wheeler*, 812 F.3d at 1114.  All that remains, then, is the "central question" whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory

reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [his] race." *Brady*, 520 F.3d at 494; *see Walker*, 798 F.3d at 1092.

The Department asserts, here, that Dodson was disciplined (and ultimately terminated) for a non-discriminatory reason: that he failed to obey his supervisor's command to work the January 17 SD2 shift and failed to report to work on two of his scheduled workdays during the government shutdown. Dkt. 42-1 at 32. The "central question" at this stage, therefore, is whether Dodson has proffered sufficient evidence for a reasonable jury to conclude that the USCP's asserted nondiscriminatory reason was not the actual reason for Dodson's discipline and that, instead, the Department intentionally discriminated against him on the basis of his race. *See Wheeler*, 812 F.3d at 1114. A plaintiff may support an inference of pretext in a variety of ways, including by proffering evidence of "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviations from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff," or by presenting "other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker*, 798 F.3d at 1092.

Dodson seeks, principally, to undermine the USCP's justification for his discipline by establishing that white officers did not receive the same discipline for similar conduct.[4] "One

---

[4] Dodson marshals several additional arguments—some more briefly than others—to support his discrimination claim, including that (1) the USCP failed to take into consideration the mitigating circumstances as to his absence-from-duty charge, Dkt. 53-1 at 34; (2) the USCP ignored the fact that his January 20 shift began at 10:30 p.m. on January 19, 2018, *id.*; (3) "Verderosa discriminated against Dodson when an incomplete record was forwarded to the CPB for review," *id.*; and (4) the USCP erred in relying on Dodson's past disciplinary history because "each of [his] prior disciplinary actions were also discriminatory," *id.* at 35–37. Because the Court concludes, based on the above comparator evidence, that there is sufficient evidence from which

way to discredit an employer's justification is to show that similarly situated employees of a different [race] received more favorable treatment." *Wheeler*, 812 F.3d at 1115 (quoting *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008)). "For a plaintiff to prove that she is similarly situated to another employee, she must demonstrate that she and the alleged similarly-situated employee 'were charged with offenses of comparable seriousness,'" and "that all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee." *Id.* at 1115–16 (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 801 F.3d at 301.

Dodson contends that each of the proposed comparators that he invokes in his opposition were "USCP police officers in the rank of Private First Class, with the same job duties," "all subject to the same Rules of Conduct," and "all subject to investigations and disciplinary charges (or exonerations) brought by the Office of Professional Responsibility." Dkt. 63 at 3. In response, the USCP has failed to offer any evidence indicating that the comparators should be differentiated in terms of their roles and responsibilities—either because they served in positions above or below Dodson's pay grade or for any other reason. Nor has the USCP contested that many of the same supervisors were, in fact, involved in making disciplinary decisions with respect to the proposed comparators. The Court must, accordingly, considers whether the

---

a jury could reasonably conclude that the USCP's stated reasons for Dodson's termination were pretextual, the Court need not decide whether these additional arguments support Dodson's discrimination claim as well.

identified officers are suitable comparators based primarily on the "similarity of their offenses."
*Burley*, 801 F.3d at 301.

1.    *Comparators as to Dodson's January 17, 2018 absence*

As to his absence from the January 17 SD2 shift, Dodson identifies at least three white
officers whom he contends were similarly situated but treated more favorably: Officers 20, 10,
and 16.[5]  Dkt. 53-1 at 23.  Like Dodson, each officer was charged with a disciplinary violation
after refusing to work an SD2 shift at the end of their SD1 shifts; each also requested (and was
denied) medical leave after being drafted to work the SD2 shift.  Dkt. 49 at 17, 91–92, 371–72
(Def.'s Ex. 5).  By the conclusion of each officer's disciplinary process, Officer 20 was left with
a sustained absence-from-duty charge and a CP-534 with a warning, *id.* at 6; Dkt. 53-22 at 2–3
(Pl.'s Ex. 20); Officer 10 with a sustained absence-of-duty and insubordination charges and a
CP-534 with a warning, Dkt. 49 at 389–90 (Def.'s Ex. 5); and Officer 16 with a full exoneration
of all charges, *id.* at 89–90.  Like Officers 10 and 16, Dodson was initially charged with both
absence from duty and insubordination, Dkt. 42-9 at 10 (Def.'s Ex. 7), although his absence-of-
duty charge was eventually grouped together with other discipline into an unsatisfactory
performance charge, Dkt. 42-4 at 136 (Def.'s Ex. 2).

A review of each officer's disciplinary report indicates, moreover, that several of the
same supervisors that approved Dodson's discipline were involved in the discipline (or lack
thereof) of each proposed comparator.  Deputy Chief Rudd, who ultimately affirmed Dodson's

---

[5] Dodson also proposes Officers 7 and 8, two white officers who invoked FMLA coverage and
who were ultimately excused from working additional SD2 shifts, as possible comparators.  Dkt.
53-1 at 38.  The USCP contends, in response, that Officers 7 and 8 are not suitable comparators
because Dodson, unlike these officers, "undisputedly did not have a pre-approved FMLA
entitlement."  Dkt. 57 at 13.  The Court need not decide whether Officers 7 and 8 are suitable
comparators because there is sufficient evidence from which a jury could reasonably conclude
that Officers 20, 10, and 16 were similarly situated to Dodson and were treated more favorably.

CP-535s, Dkt. 42-12 at 10–15 (Def.'s Ex. 10), signed off on the CP-534s issued to Officer 20,

Dkt. 53-22 at 3 (Pl's Ex. 20), and Officer 10, Dkt. 49 at 392 (Def.'s Ex. 5), and the memorandum

recommending Officer 16's exoneration was transmitted "thr[ough]" Lieutenant Denea M.

Newell to Inspector Patrick J. Herrle, Dkt. 49 at 89 (Def.'s Ex. 5), who respectively "[a]pproved"

and "[c]oncu[red]" on the investigatory report that sustained Dodson's disciplinary charges, Dkt.

42-4 at 163 (Def.'s Ex. 2).   With this context, the Court considers each proposed comparator in

turn.

Dodson argues, first, that Officer 20 was treated more favorably than he was because

Officer 20 was charged with absence from duty, and not with insubordination, after refusing to

work the SD2 shift.   Dkt. 53-1 at 38.   The USCP responds that Officer 20 is an unsuitable

comparator because his supervisor, unlike Dodson's, failed specifically to order Officer 20 to

work the relevant SD2 shift—an order that USCP frames as a prerequisite to charging an officer

with insubordination.   Dkt. 57 at 11.   The Department argues, in other words, that officers are

charged with insubordination and absence from duty only if a supervisor both instructs an officer

to work the relevant shift, telling him that he will be considered "AWOL" if he does not do so,

*and* specifically orders him to stay.   *Id.*

The USCP's proposed distinction between Dodson and Officer 20 appears, on first blush,

to be borne out in the record.   The investigatory interviews attached to Officer 20's ROI indicate

that Officer 20 and his supervisor agreed that Officer 20 was never *ordered* to work the SD2

shift, Dkt. 49 at 26, 29 (Def.'s Ex. 5), and the "findings" section of the resulting ROI accordingly

focuses on the fact that Officer 20's supervisor "advised him if he did not stay, he would be

considered AWOL," *id.* at 18.   Dodson, unlike Officer 20, agreed in his investigatory statement

that "Lt. Bodziony and[/]or Sgt. Davis order[ed] [him] to stay for [his] unscheduled draft," Dkt.

42-9 at 19 (Def.'s Ex. 7), and the findings section of his ROI indicates that "Sergeant Davis . . . order[ed] him to stay to work his draft responsibilities," *id.* at 10.  Further supporting the distinction between Dodson and Officer 20 is the fact that OPR reclassified Officer 16's charge of insubordination as "Not Sustained" upon consideration of the fact that Officer 16's supervisor instructed him, exclusively, that "if he did not find a qualified substitute and left work he would be considered 'AWOL.'"  Dkt. 49 at 89 (Def.'s Ex. 5).  In light of this statement, OPR concluded that "the most appropriate violation" is "Absence from Duty by itself, and not coupled with . . . Insubordination."  *Id.* at 89–90.

It is far from clear, however, that the Department has consistently tied its charges of insubordination to the existence of a supervisor's order to work a particular shift.  Although the USCP contends, for example, that a Black officer, Officer 15, was "not charged with Insubordination because [his] . . . supervisor[] failed to give [him] a direct order to stay," Dkt. 57 at 11, Officer 15's ROI explicitly determined that "Sergeant Fleming . . . ordered him to stay to work his draft responsibilities," Dkt. 49 at 129 (Def.'s Ex. 5)—a finding that aligns with Sergeant Fleming's report that Officer 15 "was ordered to stay," *id.* at 136.  On the other hand, Officer 10, a white officer, was charged with both insubordination and absence from duty, *id.* at 371, notwithstanding the fact he does not appear to have been explicitly ordered to stay for the relevant holdover shift (beyond the more typical instruction that he was "still obligated as a hold over draft" and that he would be "AWOL if [he] d[id] not stay for [his] draft obligation," *id.* at 390–91).  Although the USCP's disciplinary decisions as to Officers 15 and 10 do not themselves bolster Dodson's claim of racial discrimination, given the race of those officers, they do tend to undermine the allegedly operative distinction between Dodson and Officer 20.  These "inconsistent . . . explanations" as to the decision to charge officers with insubordination and the

"deviations from [supposedly] established procedures or criteria" on this issue, moreover, weaken USCP's purportedly neutral explanation of Dodson's discipline—even aside from the direct comparison between Plaintiff and Officer 20.  *See Walker*, 798 F.3d at 1092.

The Court next considers Officer 10.  Like Dodson, Officer 10 received "sustained" charges of both absence from duty and insubordination for failing to work the SD2 shift on June 13, 2017.  Dkt. 49 at 371 (Def.'s Ex. 5).  Dodson highlights that, despite the similarity between his and Officer 10's charges, Dodson ultimately received multiple CP-535s, while Officer 10 received a CP-534 with a warning.  Dkt. 53-1 at 38.  The Department responds that Officer 10 is not "similarly situated" because Officer 10's "disciplinary history was minimal as compared to [Dodson's]."  Dkt. 57 at 12.

It is true that Officer 10's disciplinary history appears, in the first instance, to be substantially more circumscribed than Dodson's.  Officer 10's disciplinary report notes only one previously sustained disciplinary charge, a CP-534 for Insubordination, Dkt. 49 at 390 (Def.'s Ex. 5), while Dodson's included two CP-534s and multiple sustained CP-535s with corresponding suspensions, Dkt. 42-4 at 161 (Def.'s Ex. 2).  As decisions in this district have explained, "different disciplinary histories" constitute "differentiating or mitigating circumstances that [c]ould distinguish [employees'] conduct or the employer's treatment of them."  *Duru v. District of Columbia*, 303 F. Supp. 3d 63, 74 (D.D.C. 2018) (quoting *Ey v. Off. of Chief Admin. Officer of U.S. House of Rep.*, 967 F. Supp. 2d 337, 345 (D.D.C. 2013)).

The difference between Dodson's and Officer 10's disciplinary histories, however, does not altogether foreclose the Court's comparison of the two officers.  To begin, Dodson presents evidence that Officer 10 *did* have prior performance issues, although they did not all result in sustained disciplinary action.  Officer 10's OPR report reveals that he had previously been

charged with six disciplinary violations with five distinct OPR case numbers—one of which was categorized as "exonerated," one as "not sustained," two as "unfounded," and two as "resolved." Dkt. 49 at 390.  The Court lacks, on the present record, any explanation as to the underlying facts of these charges and what meaning, if any, the "resol[ution]" of such a charge entails.  *Id.*  The Court also notes that, prior to the absence-from-duty and insubordination charges relevant here, Officer 10 was placed on "leave restriction status" because of his high use of unscheduled leave between October 23, 2016 and February 8, 2017.  Dkt. 49 at 383.  Indeed, his notice of leave restriction indicates that Officer 10 had been "absent without leave (AWOL) for 39 hours" in the preceding six months.  *Id.*

Dodson's disciplinary history, moreover, was only one among many considerations in the USCP's disciplinary decision—especially for the insubordination charge, which did not itself hinge on Dodson's disciplinary history in the way the unsatisfactory-performance charge did. Dkt. 42-11 at 8–13.  *Cf. Wheeler*, 812 F.3d at 1119 (considering, in assessing the propriety of comparators with different performance histories, whether that performance history factored into the disciplinary decision).  In her penalty recommendation as to the insubordination charge, Officer Ball considered multiple "recent . . . cases in which sworn employees have been disciplined in connection with sustained Insubordination charges," including at least one officer "who had *no prior discipline*" and still "received a CP-535 and a 2-day suspension."  Dkt. 42-11 at 11 (emphasis added).  And beyond the fact of Dodson's disciplinary history, Ball explained that a substantial penalty was warranted because "Officer Dodson's failure to heed his supervisor's direct order[,] . . . left his Division without proper coverage[,] and likely inconvenienced another employee on the draft list who would have been required to report for duty when it was legitimately Officer Dodson's turn to work overtime."  *Id.* at 11–12.  This

28

insubordination, according to Ball, "had a negative impact on the efficiency of the Department and could have interfered with the Department's ability to perform its primary mission." *Id.* at 12. These same factors presumably applied similarly to Officer 10, who failed to report to the SD2's detail after being told twice that he had been drafted for the SD2 shift. Dkt. 49 at 372 (Def.'s Ex. 5). Without more information as to Officer 10's disciplinary history and the practical consequences of his insubordination, the Court cannot accept the USCP's contention that no reasonable jury could find that Officer 10 is suitable comparator. Under these circumstances, it is for the jury to decide "whether [the] two employees are similarly situated." *Wheeler*, 812 F.3d at 1116.

Finally, Dodson draws the Court's attention to Officer 16, who he submits was treated more favorably than Dodson because he was ultimately "exonerated" on his absence-of-duty charge after "testif[ying] [that] he was not feeling well (stomach virus)," recounting that he "advised a supervisor that he could not perform his unscheduled additional duty due to the illness," and "br[inging] a medical note the following day." Dkt. 49 at 90 (Def.'s Ex. 5). The USCP responds that Officer 16 is not similarly situated to Dodson because Dodson, unlike Officer 16, "did not see a doctor on the day that he refused to work additional duty." Dkt. 57 at 13.

To be sure, the medical note submitted by Officer 16 differs from Dodson's. Officer 16's note indicates that he "was seen" by the doctor on April 25, 2018 (the day that he left work) and that he could "return to work/school on [April 26, 2018]." Dkt. 49 at 98 (Def.'s Ex. 5). Dodson's note, by contrast, states that he was seen on January 19, 2018 (two days after he refused to work the SD2 shift) and asks that he be excused him from work on January 19 only. Dkt. 42-9 at 18 (Def.'s Ex. 7). It is not clear from the record, however, that the question of

whether officers "see a doctor on the day that [they] refuse[] to work additional duty," Dkt. 57 at 13, carries the weight that the USCP posits. Officer 20, for example, provided USCP with a doctor's note asking that he be excused from work on the day of his refusal to work the SD2 shift; Officer 20's absence-from-duty charge was nevertheless sustained. *See* Dkt. 49 at 27 (Def.'s Ex. 5) (doctor's note, dated October 7, 2018, indicating that Officer 20 "will not be able to return to work/school until [October 8, 2018] due to medical reasons" after he left work on the morning of October 7, 2018); *id.* at 18. Medical conditions, moreover, often arise without advance warning, and doctors are not always available to see a patient immediately. Absent further clarity as to the circumstances that exonerate officers who refuse to work additional duty due to illness, the Court will leave the comparison between Officer 16 and Dodson to the jury.

It is true that none of the officers Dodson identifies are perfect comparators, and USCP has identified one or more factors as to each officer that may, eventually, make them unhelpful reference points against Dodson. But as the D.C. Circuit has explained, employees need not be identical or have the "exact same offense" for the Court to conclude that they are "similarly situated." *Wheeler*, 812 F.3d at 1118. Indeed, it seems unlikely that two disciplinary proceedings—particularly those relating to insubordination—are ever identical. Even more to the point, the USCP has failed to establish that the factors that it says distinguish Dodson from Officers 10, 16, and 20 were determinative, especially where the policies that supposedly undergird these distinctions were not applied consistently to other SD1 officers who engaged in similar behavior. Viewing the evidence in the light most favorable to Dodson, and "recognizing that determining whether two employees are similarly situated is ordinarily a question of fact for the jury," *id.* at 1116, the Court concludes that there is sufficient evidence from which a jury

could reasonably conclude that one or more of the proposed comparators were similarly situated to Dodson in all *relevant* respects with respect to his January 17 absence.

2.      *Comparators as to Dodson's January 20–21, 2018 absence*

As to his absence during the government shutdown, Dodson identifies two white officers who were absent from work during the shutdown, but who were exonerated from any discipline: Officers 10 and 11.  Much like Dodson, Officers 10 and 11 were each placed on unscheduled sick leave before the shutdown began—Officer 10 on January 19, 2018 and Officer 11 on January 18, 2018.  Dkt. 49 at 32 (Officer 10) (Def.'s Ex. 5); *id.* at 247 (Officer 11).  Both officers returned to duty on January 23, 2018; given their respective shift schedules, then, Officer 11 failed to appear for her regularly scheduled duty on January 22, 2018, *id.* at 247–48, and Officer 10 failed to appear for his regularly scheduled duty on both January 20 and 21, 2018, *id.* at 31–32.  Dodson, similarly, was marked in the "sick book" as taking sick leave on the evening of January 17, 2018 and failed to appear for his regularly scheduled duty during the government shutdown on January 20 and 21, 2018.  Dkt. 42-2 at 20 (Def.'s SUMF ¶ 147).  Although different supervisors conducted the initial investigations as to each officer's absence, Bodziony concurred on the ROIs that were issued as to Dodson and to Officers 10 and 11, and each ROI required the signatures of SD3 Captain Eric Keenan and Senate Division Commander Jeffrey Pickett.  *See* Dkt. 49 at 33, 249 (Def.'s Ex. 5); Dkt. 42-6 at 28 (Def.'s Ex. 4).

The USCP contends that Officers 10 and 11 are inapt comparators because their medical documentation, unlike Dodson's, states that Officers 10 and 11 "were unable to work due to medical reasons until a specific date."  Dkt. 57 at 15.  "SD1 officials exonerated Officer 10 and Officer 11," the Department argues, because they provided "sufficien[t] . . . medical notes," while Dodson's note "neither provided information regarding absences on the dates [after

31

January 19, 2018] nor indicated that Plaintiff was unable to work until some specified date." *Id.*
The doctor's notes themselves are, however, far less helpful in differentiating Dodson from
Officers 10 and 11 than the USCP maintains. Officer 11, who was absent from duty on January
22, 2018, submitted a medical note indicating that she was "under the indicated provider's care"
on January 23, 2018, the day *after* her absence, and that she was "able to return to school or
work" with no restrictions that same day. Dkt. 49 at 251 (Def.'s Ex. 5). Officer 10, who was
absent on January 20 and 21, 2018, submitted a note stating that he "was seen at Righttime
Medical Care on [January 22, 2018] and is able to return to work/school daycare on [January 22,
2018]." *Id.* at 34. Officer 10's note also indicates that he should be "excuse[d] . . . from missed
days of work" but does not specify which days, if any, are at issue in the note. *Id.*

Neither note, in fact, asserts that the officers were "*unable* to work due to medical
reasons" until their date of return, as the USCP contends, and neither note would have satisfied
Officer Brown's requirement of Dodson that he submit a medical note excusing him for each day
of absence during the shutdown. *See* Dkt. 48 at 173–76 (Def.'s Ex. 3) (Dodson Dep.); Dkt. 42-2
at 24 (Def.'s SUMF ¶ 181). It is also unclear from the record why a medical note indicating that
Officer 11 went to the doctor the day *after* her absence would, necessarily, be preferable to a
note stating that Dodson was seen the day *before* his absence—especially because Dodson's
January 20 shift appears to have begun at 10:30 p.m. on the night of January 19, the day of his
visit to the doctor. Dkt. 42-2 at 14 (Def.'s SUMF ¶ 96); *id.* at 16 (Def.'s SUMF ¶ 120). In any
event, the notes submitted by Officers 10 and 11 seem to hew closer to Assistant Chief Sund's
instruction that "anyone returning from a furlough due to an allegation of being sick provide a
doctor[']s note indicating they are able to return," Dkt. 53-31 at 3 (Pl.'s Ex. 29), a policy that
seems not to have been applied to Dodson. On the present record, and without further clarity as

to why the medical notes submitted by Officers 10 and 11 were preferable to Dodson's, the Court leaves the comparison between Dodson and these officers to the jury.

In sum, the Court is persuaded that the evidence in the record as to these comparators is sufficient for Dodson to fend off the USCP's motion for summary judgment. As the Supreme Court and the D.C. Circuit have emphasized time and again, the Court's role at this juncture is not to weigh evidence or to make credibility determinations. *Wheeler*, 812 F.3d at 1113; *Holcomb*, 433 F.3d at 895; *see also Liberty Lobby*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). The question, moreover, is not whether Dodson has proven to the Court's satisfaction that the USCP discriminated against him, but only whether he has provided sufficient evidence for a reasonable jury to reach that conclusion. Although the USCP's evidence does suggest certain distinctions between Dodson and each of his proposed comparators, the evidence falls short of establishing that these distinctions are dispositive. Viewing the evidence in the light most favorable to Dodson and recognizing that determining whether two employees are similarly situated is typically a question of fact for the jury, *Wheeler*, 812 F.3d at 1116, the Court declines to grant summary judgment to the USCP with respect to Dodson's disparate treatment claim.

**B.     Retaliation**

The CAA makes it "unlawful for an employing office to intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by this chapter." 2 U.S.C. § 1317(a). Claims arising under § 1317 of the CAA are analyzed under the framework and standards governing Title VII's anti-retaliation provision. *See Hollabaugh v. Off. of the Architect of the Capitol*, 847 F. Supp. 2d 57,

66 (D.D.C. 2012).  The Court, accordingly, evaluates Dodson's retaliation claims under "the familiar burden-shifting framework of *McDonnell Douglas*."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

To establish a prima facie case of retaliation, a plaintiff must present evidence "(1) that he opposed a practice made unlawful by Title VII [or otherwise engaged in statutorily protected activity]; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action because the employee opposed the practice [or engaged in other statutorily protected activity]."  *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2015)).  "If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a 'legitimate, nondiscriminatory reason' for its actions."  *Jones*, 557 F.3d at 677 (quoting *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)).  If the employer does so, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence."  *Id.* (quoting *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)).

Here, the USCP says that Dodson was terminated for a legitimate, non-retaliatory reason—that is, because he disregarded his supervisor's instructions and failed to report to work during the government shutdown.  Dkt. 42-1 at 42.  The Court, accordingly, "reviews each of the three relevant categories of evidence—prima facie, pretext, and any other—to determine whether they either separately or in combination provide sufficient evidence for a reasonable jury to infer" that Dodson engaged in protected activity and that the USCP subjected him to adverse action because of that activity.  *Jones*, 557 F.3d at 679 (internal quotation marks omitted).  The USCP argues that summary judgment is warranted on Dodson's retaliation claim (1) because,

with respect to some portions of his claim, he has failed to establish that his complaints to his supervisors constituted "oppos[ition] [to] a practice made unlawful by the CAA," and (2) because, with respect to the remaining portions of his claim, he has failed to present evidence raising a plausible inference of causation.  Dkt. 42-1 at 40.  The Court addresses each argument in turn.

       1.   *Protected Activity*

Dodson alleges that he engaged in a variety of protected activities from 2010 through 2018.  He asserts that he "regularly spoke out about the Department treating him less favorably than his Caucasian colleagues," Dkt. 1 at 3 (Compl. ¶ 15), including in 2010 when he "notified his Sergeants, Lieutenants and Captains that Black officers were drafted more frequently for overtime" and had a harder time trading shifts than their white counterparts, Dkt. 53-1 at 41; when he asked Sergeant Green after his transfer to SD1 "why he and other Black officers were being drafted for duty more often than White officers," *id.* at 11; and when he questioned Sergeant Fleming, sometime during his two years in SD1, as to "why [he] was . . . being singled out on this division," Dkt. 48 at 212–13 (Def.'s Ex. 3) (Dodson Dep.).  Dodson further asserts that he engaged in protected activity when, in January 2018, he "questioned why the Department ordered him to work an additional shift," "questioned Sergeant Brown as to why he would not accept his doctor's note in accordance with past practice," and "asked Sergeant Brown how to properly document his sick leave."  Dkt. 1 at 8 (Compl. ¶¶ 50–51); Dkt. 53-1 at 42.

"Although Title VII protects informal complaints," *Barot v. Embassy of Republic of Zambia*, 299 F. Supp. 3d 160, 188 (D.D.C. 2018), the D.C. Circuit has made clear that "[n]ot every complaint garners its author protection under Title VII," *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).  For example, "ambiguous complaints that do not make the

employer aware of alleged discriminatory misconduct do not constitute protected activity."
*Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 128 (D.D.C. 2015) (quoting *Int'l
Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y.
2007)).  "While no 'magic words' are required, the complaint must in some way allege unlawful
discrimination—that is, discrimination on the basis of a protected characteristic."  *Brady v. U.S.
Capitol Police*, 200 F. Supp. 3d 208, 214 (D.D.C. 2016) (internal quotation marks omitted); *see
also Beyene v. Hilton Hotels Corp.*, 815 F. Supp. 2d 235, 247 (D.D.C. 2011) (granting summary
judgment on retaliation claim because there was "no evidence" that plaintiff's complaint to his
employer "alleged unlawful discrimination based on his membership in a protected class");
*Logan v. Dep't of Veteran Affs.*, 404 F. Supp. 2d 72, 77 (D.D.C. 2005) (concluding that
plaintiff's grievances did not constitute protected activity "because they [did] not include a claim
of discrimination based upon race, color, religion, sex or national origin").

The Court concludes—and the USCP does not appear to dispute—that Dodson's alleged
complaints to his supervisors in 2010 and to Green (apparently) sometime after Dodson
transferred to SD1 in 2016 readily satisfy the standard for protected activity articulated by the
D.C. Circuit in *Broderick.  See* Dkt. 57 at 31.  In both instances, Dodson questioned why he and
other Black officers were treated differently from their white counterparts.  *See* Dkt. 48 at 43–44,
238–39 (Def.'s Ex. 3) (Dodson Dep.).  He asked, for example, in 2010, "why certain . . . white
officers . . . ha[d] posts that they wanted" and could "swap out their shifts," while he and other
Black officers could not.  *Id.* at 43.  And he later "pointed out to Sergeant Green that [he] was
being drafted more often than the white officers."  *Id.* at 238.  These comments "alleged
unlawful discrimination based on [race]," *Beyene*, 815 F. Supp. 2d at 247, and thus qualify as
protected under Title VII and the CAA.

The same cannot be said, however, with respect to Dodson's January 2018 comments addressing Bodziony's order to work the SD1 shift and his response to Brown's direction that he provide a doctor's note covering the specific days of his absence.  Dodson describes these complaints in his opposition to summary judgment as "question[ing] and sp[eaking] out against . . . discriminatory actions," but he nowhere asserts that, in making these complaints, he alleged discrimination or even mentioned race to Brown or Bodziony.  Dkt. 53-1 at 42.  Rather, in Dodson's framing, he raised general objections as to "why [Bodziony] was ordering him to work even though he was sick;" to "not knowing exactly what information his medical provider needed to document to excuse his absences;" and to not having "a copy of the policy" governing medical notes.  *Id.*  Because these complaints do not allege "discrimination on the basis of a protected characteristic," *Brady*, 200 F. Supp. 3d at 214 (internal quotation marks omitted), they are not protected activity, *see, e.g.*, *Washington v. Wash. Metro. Area Transit Auth.*, 788 Fed. App'x. 1, 4 (D.C. Cir. 2019) (concluding that plaintiff's Title VII retaliation claim "necessarily fails" where she "complained only that the offending employee was purportedly rude to her" without indicating that the employee's conduct was based on a protected category (internal quotation marks omitted)); *Miles v. Wash. Hosp. Ctr. Corp.*, No. 22-cv-287, 2022 WL 2304034 (D.D.C. June 27, 2022) (deciding that a "retaliatory termination claim fail[ed]" where plaintiff never complained "that his supervisor's actions were related to his sex").

A closer question is posed by Dodson's testimony that he asked Sergeant Fleming, sometime after transferring to SD1 in 2016, "why [he] was . . . being singled out on this division," Dkt. 48 at 212–13 (Def.'s Ex. 3) (Dodson Dep.).  Although neither party has provided the Court with Dodson's responses to the USCP's interrogatories, the Court can infer from Dodson's deposition testimony that those responses assert that Dodson spoke to Fleming "about

the discrimination and retaliation [he] alleged[ly] . . . received from Brown and Bodziony." *Id.*
at 211.  Dodson's deposition testimony about the details of his conversation with Fleming, in
contrast, does not specifically recount a report of racial discrimination.  Rather, Dodson
describes "basically trying to understand why [he] was being treated the way that [he] was" and
"why [he] was . . . being singled out on th[e] division." *Id.* at 212.  But based on the full context
of Dodson's deposition testimony, which describes Bodziony "attacking [him] or challenging
[him] based off of the color of [his] skin and not the merit of [his] work," *id.* at 210, immediately
before confirming that he told Fleming "about the discrimination and retaliation [he] . . . received
from Brown and Bodziony," *id.* at 211, the Court concludes that Dodson has done enough,
although just enough, to create a genuine issue of material fact as to whether this conversation
with Fleming constituted protected activity.

      2.   *Causation*

      Because the scope of Dodson's retaliation claim is limited as described above, the Court
considers only whether Dodson has established that the USCP "took a materially adverse action
against him" (1) because of his 2010 complaints to his supervisors or (2) because of his later
questions to Green and Fleming.  *See Harris*, 791 F.3d at 68 (internal quotation marks omitted).
Dodson fails to present any evidence that he was disciplined (or that the USCP took any other
adverse action against him) as a result of these complaints, arguing instead that his "termination
is unjustified and unsupported by credible evidence" and that a "jury can . . . [thus] reasonably
infer that[,] in addition to discrimination, Dodson's questioning of his supervisors' actions" led
to his investigation and discipline.  Dkt. 53-1 at 43.  To be sure, a plaintiff asserting a retaliation
claim need not "provide *direct* evidence that his supervisors knew of his protected activity" to
survive a motion for summary judgment. *Jones*, 557 F.3d at 679 (emphasis added).  But he must

at least "offer circumstantial evidence that could reasonably support an inference that" his supervisors—or others in position to influence his employer's adverse action—did so. *Id.* More generally, once the defendant comes forward with a legitimate, nondiscriminatory justification for its action, the plaintiff must proffer evidence sufficient to "create[] a material dispute on the ultimate issue of retaliation." *Id.* at 678. To meet this burden, the plaintiff might show, for example, that "the employer had knowledge of the employee's protected activity, and . . . [that] the adverse personnel action took place shortly after that activity." *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (omission in original) (internal quotation marks omitted); *see also Williams v. Spencer*, 883 F. Supp. 2d 165, 178 (D.D.C. 2012). But that is just one way to make the required evidentiary showing, and, because the ultimate question remains whether a reasonable jury could find that the employer's stated rationale was pretextual and that its actual reason was retaliatory, courts must consider the parties' arguments in light of summary judgment record as whole.

At the outset, the Court concludes that Dodson's 2010 complaints to his supervisors, Dkt. 48 at 42–43 (Def.'s Ex. 3) (Dodson Dep.), are too far removed from the 2018 discipline at issue here to raise an inference of retaliatory motive, at least without some further evidence connecting the two sets of disparate events. Although this Court has not fixed the "'maximum time lapse between protected Title VII activity and alleged retaliatory actions,' it is well established that the temporal proximity between the two must be 'very close' to show a causal connection." *McIntyre v. Peters*, 460 F. Supp. 2d 125, 133 (D.D.C. 2006) (first quoting *Brodetski v. Duffey*, 141 F. Supp. 2d 35, 43 (D.D.C. 2001), then quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)); *see also Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015) ("The temporal proximity of an adverse action close on the heels of protected activity is a common and highly

probative type of circumstantial evidence of retaliation."). Courts in this district "have often followed a three-month rule to establish causation on the basis of temporal proximity alone." *McIntyre*, 460 F. Supp. 2d at 133. Here, the eight-year gap between Dodson's complaint and his discipline is far too wide to raise any inference of causality. *See Clark Cnty. Sch. Dist*, 532 U.S. at 273–74 (concluding that where "there [was] no indication that" plaintiff's supervisor "knew about the [relevant protected activity]," an "[a]ction taken . . . [twenty] months later suggests, by itself, no causality at all"). This is particularly so given the absence of evidence that the decisionmakers were aware of the 2010 complaints or that those complaints played any role in the disciplinary process.

The timing of Dodson's complaints to Fleming and Green, in contrast, is far less clear. In neither case has Dodson indicated when exactly he raised the complaints, explaining only that he spoke with Fleming at some point during his "two years" in SD1, Dkt. 48 at 213 (Def.'s Ex. 3) (Dodson Dep.), and that he discussed with Green the assignment process for extra SD1 shifts, presumably also during his time in that division, *id.* at 238. Because Plaintiff bears the burden, at this point, of showing that a reasonable jury could find that the USCP's stated reason for taking disciplinary action against him was pretextual and that the true reason was retaliatory, that uncertainty works against Plaintiff. But even if the Court assumes that Dodson could make out a prima facie case for retaliation based on temporal proximity—and the Court is unpersuaded that he could—his retaliation claim cannot survive summary judgment. "Mere temporal proximity" is insufficient to defeat an employer's "proffer[] [of] a non-retaliatory explanation for the adverse employment action," because otherwise "protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim." *Iyoha v. Architect of the*

*Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007)).  "As a result, 'positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations [for the adverse employment action] are genuine.'"  *Id.* (alterations in original) (quoting *Woodruff*, 482 F.3d at 530).

Dodson has not offered any evidence—aside from his challenge to the merits of his termination, Dkt. 53-1 at 43—to show that the USCP's disciplinary decisions were motivated by a desire to retaliate against him.  To be sure, Fleming (to whom Dodson allegedly complained) was assigned the task of investigating Dodson's January 17 refusal to work.  *See* Dkt. 53-2 at 43 (Pl.'s SOF ¶ 153); Dkt. 42-9 at 4 (Def.'s Ex. 7) (Fleming Decl. ¶ 17).  But Dodson points to no evidence that Fleming's investigation was influenced by their prior conversation or that Fleming was offended by or in any way hostile to Dodson's claims of mistreatment by Brown and Bodziony.  There is no evidence, moreover, that Green ever told the officesr involved in Dodson's disciplinary proceeding that Dodson had complained to her.  *Cf. Iyoha*, 927 F.3d at 574 (noting that the supervisor who discussed plaintiff's workplace harassment complaint "played no role in the [relevant] hiring processes").  Without more to support an inference of retaliation, Dodson has failed to proffer sufficient evidence for a reasonable jury to infer that the USCP subjected him to adverse action because of his statutorily protected activity.  *See Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 19 (D.D.C. 2014); *see also Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1174 (D.C. Cir. 2021) (concluding that, absent "circumstantial evidence that could reasonably support an inference that those who recommended or imposed the [relevant] suspension had knowledge of [plaintiff's] protected activity," there was "insufficient [evidence] to show that [the suspension] was retaliatory" (internal quotation marks omitted)).

The Court, accordingly, grants the USCP's motion for summary judgment as to Count II.

C.      **Procedural Due Process**

Finally, the Court considers the parties' cross-motions for summary judgment with respect to Count III of the complaint.  To prevail on his procedural due process claim, Dodson must show both a deprivation of "life, liberty, or property" and that "the procedures used by the Government in effecting the deprivation [did not] 'comport with due process of law.'"  *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).  The USCP does not appear to dispute, at this stage of the litigation, that Dodson has satisfied the first of these requirements—that is, that he had (and lost) a property interest in his employment.  *See* Dkt. 42-1 at 46–52.  As the Court has previously observed, the fact that Dodson's LCA provides for termination only if he receives a "future sustained CP-535 discipline approved by the Chief of Police or his designee which results in a suspension without pay," Dkt. 42-4 at 139 (LCA), supports the conclusion that the USCP could terminate Dodson only "*after* a predicate finding of a disciplinary violation—in other words, only for cause."  *Dodson v. U.S. Capitol Police*, 2019 WL 4860720, at *5 (D.D.C. Sept. 30, 2019); *cf. Turner v. U.S. Capitol Police*, 34 F. Supp. 3d 124, 140 (D.D.C. 2014) (noting that the statutory requirement that the Chief of Police may terminate "an officer, member or employee" only after providing notice of termination to the Capitol Police Board ("CPB"), and either receiving CPB approval or waiting for a thirty-day period to expire, 2 U.S.C. § 1907(e)(1)(B), "strongly suggests that employees covered by the statute have 'an objectively reasonable expectation' that they are otherwise 'entitled to retain' their jobs").

The Court, accordingly, turns its attention to the question whether "the procedures used by [the USCP]" in terminating Dodson comported with due process of law.  *Ralls Corp.*, 758 F.3d at 315 (quoting *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 59).  The Court, however, first takes a

moment to frame the procedural-due-process question presented by the parties' cross-motions. Although Plaintiff's complaint alleges that "his job *termination* was summary and without the procedural . . . process due to him,"[6] Dkt. 1 at 9 (Compl. ¶ 57) (emphasis added), the parties' summary-judgment briefing portrays the relevant dispute as a question about whether the USCP afforded Dodson sufficient process in issuing the CP-535's that, under the Last Chance Agreement, ultimately triggered Dodson's termination.  *See* Dkt. 42-1 at 46; Dkt. 53-1 at 46, 48–50.  The distinction is perhaps academic, because one of the CP-535's that was ultimately "sustained" against Dodson independently recommended Dodson's termination.  But for the purposes of correctly posing the precise question at issue, it is relevant that Dodson agreed in his LCA that "any future sustained CP-535 discipline approved by the Chief of Police or his designee which results in a suspension without pay" would "result in termination of his employment for the prior misconduct sustained in OPR Case No. 15-122."  Dkt. 42-4 at 139 (Def.'s Ex. 2).  As a result, Dodson's procedural-due-process claim necessarily turns on the predicate steps that led the Department to conclude that he had received the requisite "sustained CP-535 discipline approved by the Chief of Police," *id.*, which triggered his termination.

The USCP, for its part, maintains that "any claim related to the penalty of termination recommendation in OPR Case No. 15-122" is both time-barred and waived under the terms of the LCA, Dkt. 42-1 at 44–45, but it does not, at this stage of the litigation, invoke the LCA's waiver provision, Dkt. 42-4 at 139, to preclude Plaintiff's procedural-due-process claim as to the disciplinary decision that ultimately triggered his termination pursuant to the LCA.  The USCP, instead, moves for summary judgment on the ground that it, in fact, provided Plaintiff with the

---

[6] Plaintiff also raises a substantive due process claim in his complaint, Dkt. 1 at 9 (Compl. ¶ 57), which the Department does not address in its motion for summary judgment.  That claim, therefore, remains live for the time being.

43

essential requisites of due process in issuing that disciplinary decision. *See* Dkt. 42-1 at 46. In

the Department's view, Dodson received "written and oral notice of the charges against him"

when Deputy Chief Rudd "issued him the CP-535s on April 30, 2018," Dkt. 42-1 at 46, and he

"had an opportunity to present reasons as to why the proposed disciplinary actions should not be

taken in a detailed, four-page letter sent to Chief Verderosa" on May 4, 2018—to which Chief

Verderosa responded on May 9, 2018, *id.* at 48–49. And, to the extent that Dodson argues that

he should have been afforded the opportunity appeal the CP-535s that he received, the

Department contends that "Plaintiff [has] failed to provide any evidence that he actually availed

himself of the CBA [appeal] procedures he now complains he was denied." Dkt. 57 at 34.

Because of its relevance to the scope of the Court's procedural-due-process review, the

Court addresses, first, the USCP's argument that Dodson failed to avail himself of the procedures

that "he now complains he was denied." *Id.* The Court begins by tracing the peculiar evolution

of the USCP's interpretation of Dodson's LCA—beginning with Chief Verderosa's initial

interpretation of the LCA in his May 14 letter to Dodson's counsel. When Dodson was notified

of the CP-535s against him by then-Deputy Chief Rudd, Dodson's union counsel wrote to Chief

Verderosa about the process afforded to Dodson, asserting that "[t]he CP-535s issued to Officer

Dodson ha[ve] not been 'sustained[]' and will not be sustained until he has completed the

disciplinary appeal/grievance process described in Article 31 of the parties' Collective

Bargaining Agreement." Dkt. 42-3 at 10 (May 4, 2018 Letter). "If Officer Dodson is afforded

the process to which he is entitled," counsel indicated, "[Dodson] will be able to prove that he

did not engage in misconduct warranting *any* CP-535 discipline." *Id.*

The USCP contends, in support of its motion for summary judgment, that Chief

Verderosa's response to Dodson's counsel "did not specifically address whether Plaintiff could

appeal the CP-535s he received through the grievance process."  Dkt. 57 at 36.  But, in fact,

Verderosa responded:

> You allege in your letter attached to the May 4, 2018 e-mail[] that this charge
> was not properly sustained until Officer Dodson had a chance to grieve the
> discipline through the CBA.  I do not agree.  Under paragraph 2 of the LCA, any
> sustained CP-535 discipline by the Chief of Police within five years will result
> in a termination for OPR Case No. 15-122.   Additionally, Officer Dodson
> waived in paragraph 3 all rights to grieve or in any way challenge the results of
> OPR Case No. 15-122, this LCA, *or any future action* taken by the Department
> as a result of his violation of the terms of this LCA.

Dkt. 42-3 at 15 (Def.'s Ex. 1) (emphasis in original).  Read in concert with counsel's letter,

which clearly requests an opportunity to appeal or grieve the CP-535s and to establish that

Dodson "did not engage in misconduct warranting . . . discipline," *id.* at 10, Chief Verderosa's

response is sensibly read to say—and a reasonable jury could surely read it to mean—that

Dodson was foreclosed from availing himself of the CBA's appeal and grievance procedures as

to both the issuance of the CP-535s and the termination itself.  Chief Verderosa explicitly

disagreed with Dodson's counsel and emphasized that Dodson "waived in paragraph 3 all rights

to grieve . . . *any future action* taken by the Department as a result of his violation of the terms of

this LCA" before "moving forward with a recommendation of termination of employment for

[Dodson's] misconduct in OPR-15-122."  *Id.* at 15 (emphasis in original).  The LCA, moreover,

required Dodson "to refrain from further misconduct in the workplace," Dkt. 42-4 at 139 (LCA ¶

1), and Chief Verderosa's letter emphasized that Dodson waived his right to grieve "*any future*

*action* taken by the Department as a result of [Dodson's] violation of the terms of the LCA,"

Dkt. 42-3 at 15.

It is instructive, moreover, that the USCP adopted this exact interpretation of the LCA at

an earlier stage of this litigation, arguing that "Plaintiff's due process claim fails because he

exchanged his right to challenge the 2016 Rules of Conduct violation[] *and any future CP-535*

*sustained by the Chief of Police* without having an ability to appeal/grieve, litigate or in any way challenge the Chief's decision." Dkt. 16 at 24 (emphasis added); *see also id.* at 24–25 (arguing that the terms of the LCA take precedence over the terms of the CBA).

Strikingly, the USCP now contends, for the first time in its opposition to Dodson's partial motion for summary judgment, that "nothing prohibited Plaintiff or his counsel from appealing the CP-535s as set forth in the CBA," Dkt. 57 at 36, and that Plaintiff therefore "should not complain about a lack of due process when he failed to avail himself of the procedural measures that could have provided him with meaningful relief," *id.* at 34 (quoting *Payne v. District of Columbia*, 808 F. Supp. 2d 164, 174 (D.D.C. 2011)). To be sure, Dodson was represented by union counsel during this exchange with Chief Verderosa, and a reasonable jury might find that he could have pushed harder to invoke his rights to appeal under the collective bargaining agreement, even after receiving Chief Verderosa's letter. But a reasonable jury might also reject that notion and, accordingly, could find that Dodson was precluded from appealing the CP-535s that triggered his termination under the LCA. Understood in this light, a reasonable jury could also find that, to the extent that Dodson did not avail himself of the procedures outlined in the CBA, he was foreclosed from doing so by none other than the Chief of Police.

The Court's inquiry does not end there, however. "[E]ven where a protected employment interest is at stake, an agency does not violate due process merely because of a failure to follow its own procedures in the discharge proceeding." *Vanover v. Hantman*, 77 F. Supp. 2d 91, 103 (D.D.C. 1999). "Rather, for purposes of constitutional review, the procedures taken need only satisfy the minimum required by due process." *Id.*[7] The Court must, accordingly, consider

---

[7] To be sure, the *Accardi* doctrine might require, as a principle of administrative law, that "an agency . . . comply with its own regulations in effecting the removal of one of its employees."

whether, even if Chief Verderosa's letter precluded Dodson from pursuing a grievance, Dodson

nonetheless received all the process that he was *constitutionally* due.

"The essential requirements of due process," the Supreme Court has explained, "are

notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546

(1985). These requirements are "flexible"—"procedural protections" wax and wane "as the

particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Thus, a plaintiff

may receive constitutionally sufficient due process even if, for example, he "desire[s] a greater

opportunity to present [his] case than the limited nature of the [agency] hearing provided." *La.*

*Ass'n of Indep. Producers & Royalty Owners v. F.E.R.C.*, 958 F.2d 1101, 1115 (D.C. Cir. 1992).

Identifying specific dictates of due process generally requires the court to engage in the highly

context-specific inquiry of weighing "the private interest that will be affected by the official

action"; the "risk of an erroneous deprivation of such interest through the procedure used, and

the probable value, if any, of additional or substitute procedural safeguards"; and "finally, the

[g]overnment's interest, including the function involved and the fiscal and administrative

burdens that the additional or substitute procedural requirements would entail." *Mathews v.*

*Eldridge*, 424 U.S. 319, 335 (1976). At a minimum, however, the deprivation of life, liberty, or

property must be preceded by "oral or written notice of the charges against him, an explanation

of the employer's evidence" and "an opportunity to present reasons, either in person or in

writing, why proposed action should not be taken." *Loudermill*, 470 U.S. at 546; *see also*

*Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) ("[H]owever weighty the

governmental interest may be in a given case, the amount of process required can never be

---

*Vanover v. Hantman*, 77 F. Supp. 2d 91, 106 (D.D.C. 1999). But Plaintiff has nowhere claimed
that the USCP's actions violated the *Accardi* doctrine, *see generally* Dkt. 1 (Compl.), and the
Court therefore does not address it here.

reduced to zero—that is, the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to final deprivation of a property interest.").

In many cases, courts can decide whether an employee was afforded sufficient process based on the summary judgment record alone, either because the "amount of process" afforded to the employee was "reduced to zero" in a summary termination, *Propert*, 945 F.2d at 1332, or because it is clear, based on a weighing of the *Mathews* factors, that the relevant termination proceedings were constitutionally sufficient.  The present case falls somewhere in between:  It is not self-evident, based on the record before the Court, that Dodson received all the process that he was due; nor is it fair to say that Dodson received no meaningful process at all.

Dodson argues, principally, that he received insufficient notice because the USCP did not "provide him with the underlying evidence or any explanation [for the charges against him]," including "the investigative file, interview statements, and information about how similarly situated employees were treated for the same infraction."  Dkt. 53-1 at 49.  According to the letter from Dodson's counsel to Chief Verderosa, "[a]side from the information contained in the two proposed disciplinary actions, Deputy Chief Rudd did not provide Officer Dodson with any other information relating to the Department's investigation into the allegations of misconduct against him," or "the evidence used to determine [that] he engaged in misconduct."  Dkt. 42-3 at 9.  A memorandum from Deputy Chief Rudd to Dodson, moreover, confirms that Dodson received only the "two CP-535s in connection with sustained violations of" the USCP rules governing insubordination and unsatisfactory performance.  Dkt. 42-12 at 10 (Def.'s Ex. 10).

The two CP-535s, in turn, only briefly summarized the results of the Department investigation as to Dodson's January 17 departure from work and his absence during the government shutdown and indicated which USCP rules Dodson allegedly violated.  *Id.* at 12–15.

48

These forms were the only information that Dodson received regarding the allegations against him—aside, perhaps, from some minimal background information that he was able to glean from his investigatory interviews with Fleming and Brown (although the record does not reveal the extent thereof). *See* Dkt. 42-9 at 7–9 (Def.'s Ex. 7); Dkt. 42-6 at 25–26 (Def.'s Ex. 4). The first CP-535 merely asserts that "Dodson violated [USCP rules] when he left work after being notified that he had been drafted for the next shift and ordered to remain on duty." Dkt. 42-12 at 12 (Def.'s Ex. 10). The sole detail provided in support of this charge is as follows: "When he was initially advised that he was drafted, Officer Dodson responded to his supervisor, 'Well it's not gonna be me.' After again being ordered to stay and refusing, Officer Dodson asked his supervisors[,] 'Do you all want to speak to my lawyer?" *Id.* The second CP-535 is slightly longer, but the level of detail (or absence of detail) is about the same. *See id.* at 14. Neither of the documents indicates who was interviewed, what credibility judgments (if any) were made, whether any similar cases were considered for purposes of comparison, and whether the investigation revealed whether Dodson was actually sick and able to work at the relevant times. Writing to Chief Verderosa, Dodson's counsel complained that Deputy Chief Rudd "did not provide Officer Dodson with any other information relating to the Department's investigation into the allegations of misconduct against him, the evidence used to determine he engaged in misconduct, or the information that would be provided to [Chief Verderosa] for consideration of the allegations." Dkt. 42-3 at 9 (Def.'s Ex. 1).

"Both the Supreme Court and th[e] [D.C. Circuit] have recognized that the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action are essential components of due process." *Ralls Corp.*, 758 F.3d at 318; *see also, e.g.*, *Greene v. McElroy*, 360 U.S. 474, 496 (1959) (describing the "immutable" principle that "where

governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue"); *Doe v. Lieberman*, 20-cv-2148, 2021 WL 4476748, at *6 (D.D.C. 2021).  "Due process" accordingly "requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied[,] and be afforded an opportunity to rebut that evidence." *Ralls Corp.*, 758 F.3d at 319; *see also Goss v. Lopez*, 419 U.S. 565, 581 (1975) (indicating that, even for the relatively minor deprivation of a student's temporary suspension from school, the Due Process Clause requires that a "student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story").

Few decisions of this Court speak to the precise point at which notice becomes constitutionally deficient.  This Court has concluded that allowing an employee to review and rebut the reports and evidence underlying his employer's disciplinary decisions will suffice.  *See, e.g.*, *Swann v. Off. of the Architect of the Capitol*, 185 F. Supp. 3d 136, 147–48 (D.D.C. 2016), *aff'd* 2017 WL 160810 (D.C. Cir. Jan. 3, 2017) (noting that the notice requirement was satisfied where "it is undisputed that [the employer] made available to Swann the OIG report that served as the basis for her termination and that Swann received this report" and that "Swann [had] a reasonable opportunity to respond to those accusations and findings"); *Lieberman*, 2021 WL 4476748, at *6 (emphasizing that Doe received, prior to the decision to revoke her clinical privileges, "the specifications underlying the charge of unprofessional conduct," a "memorandum analyzing her performance and reviewing the evidence the agency had compiled and intended to rely on," and "a file containing that evidence"); *Barkely v. U.S. Marshal Serv. ex*

*rel. Hylton*, 766 F.3d 25, 32 (D.C. Cir. 2014) (noting that, before termination, the officer was "given the opportunity to supply additional medical information responding to the specific concerns of the physician charged with making the final decision"). But the Court has not had occasion to decide whether the failure to provide this type of information will, inevitably, run afoul of due process. And while "in some circumstances a lack of precise initial notice of the grounds for denial" may not be fatal, the deficient initial notice is then "compensated for by ready access to the adverse evidence or a summary thereof." *Gray Panthers v. Schweiker*, 652 F.2d 146, 176 (D.C. Cir. 1980); *see also States v. District of Columbia*, No. 18-cv-1652, 2019 WL 295472, at *11 (D.D.C. Jan. 23, 2019) (explaining that a notice letter was not constitutionally deficient where "plaintiff would have obtained all of th[e] information [he needed] had he simply done what the letter directed him to do").

Given the limited information contained in the two CP-535s, the Court cannot conclude—at least on the present record—that Dodson was provided sufficient notice to "rebut the evidence supporting [his discipline]." *Ralls Corp.*, 758 F.3d at 318. Chief Verderosa, moreover, readily admits that he considered, in deciding that the charges at issue were "properly sustained," Dkt. 42-3 at 14–15 (Def.'s Ex. 1), evidence that Dodson himself never had the chance to review. Alongside "the assertions set forth in [counsel's] May 4 letter" and the "CP-535s resulting from the sustained Insubordination and Unsatisfactory Performance violations," Chief Verderosa attests to reviewing the "ROI and evidence in OPR Case 18-018/18-005." *Id.* at 3 (Verderosa Decl. ¶ 5). Although it is not entirely clear from the record what kind of "evidence" Chief Verderosa is referencing, he appears (based on his summary of Dodson's conduct) to have relied—at least to some extent—on the investigatory report from OPR, on notes from interviews with Dodson and his supervisors during the course of the investigation, *id.* at 14,

and on documentary evidence like the physician's note Dodson submitted, *id.* at 15.   Even after

Dodson's explicit request to consult the evidence against him, Chief Verderosa denied the

request and reached his decision while relying on materials that Dodson never had the

opportunity to review or rebut.  Dkt. 42-3 at 15–16; *see Ralls Corp.*, 758 F.3d at 319; *see also*

*Ramirez v. Dep't of Homeland Sec.*, 975 F.3d 1342, 1350 (Fed. Cir. 2020) (concluding that the

Department violated an employee's procedural-due-process rights where they failed to provide

plaintiff with the records that he would need to "independently review" in order to "verify or

challenge th[e] [Doctor's] assumptions").

But, at the same time, the existing record and briefing falls short of demonstrating that

Dodson is entitled to prevail as a matter of law.  Despite the deficiencies in Dodson's notice, the

notice that he received was not "reduced to zero." *Propert*, 948 F.2d at 1332.  The CP-535

charging Dodson with insubordination describes, for example, that Dodson "left work after being

notified that he had been drafted and ordered to remain on duty" and that he asked his

supervisors, after refusing to stay, whether they "want[ed] to speak to [his] lawyer."  Dkt. 42-12

at 12 (Def.'s Ex. 10).  And the CP-535 charging Dodson with unsatisfactory performance

recounts the agency's policies during the government shutdown, indicates that Dodson received

a voicemail about being required to work during the shutdown, and describes Dodson's

insufficient medical documentation.  *Id.* at 14.  These CP-535s, therefore, gave Dodson *some*

notice of the basis for the proposed discipline and, in a cursory fashion, set forth "an explanation

of the employer's evidence." *Loudermill*, 470 U.S. at 546.

Dodson was also afforded, at least to some extent, "[an] opportunity to present

reasons . . . why proposed action should not be taken." *Id.*  Based on the information contained

in the CP-535s, he was able (albeit with limitations) to contest some of the factual predicates for

his discipline before Chief Verderosa affirmed the charges against him—including, for example, the allegation that Dodson had been informed, by voicemail, of his obligation to report for duty during the government shutdown.  Dkt. 42-3 at 11 (Def.'s Ex. 1).  Dodson was also able to explain that the "sergeant and lieutenant ignored his statements that he was not fit to complete another shift" on January 17, 2018 and was able to argue that this "result[ed] in [an] improper order that he remain on-duty."  Dkt. 42-3 at 10 (Def.'s Ex. 1).  In short, Dodson was provided with "*some* notice and *some* opportunity to be heard prior to final deprivation of [his] property interest."  *Propert*, 948 F.2d at 1332.

The question whether that notice and opportunity to be heard was, in the end, constitutionally sufficient turns upon a careful and fact-intensive "balancing of the competing public and private interests involved, as defined by the now familiar *Mathews* factors."  *Id.* Notwithstanding the centrality of this balancing to Court's analysis, neither party cites *Mathews* or endeavors to articulate (1) "the private interest affected by" Dodson's termination, (2) "the risk of erroneous deprivation and value of additional safeguards" or (3) "the government's interest, including the fiscal and financial burdens that additional or substitute procedural requirements would entail."  *Id.*

To be sure, the "significance of the private interest in retaining employment" has long been established.  *Loudermill*, 470 U.S. at 543.  But as to "the risk of erroneous deprivation and the value of additional safeguards," *Propert*, 948 F.2d at 1332, the parties have left the Court guessing.  In particular, Dodson has failed meaningfully to articulate whether he was, as a practical matter, denied access to information necessary to anticipate the allegations against him and to respond to those allegations in his counsel's letter to Chief Verderosa.  To the contrary, neither party has established exactly what kind of "evidence in OPR Case 18-018/18-005" Chief

Verderosa reviewed in affirming the disciplinary decisions against Dodson, Dkt. 42-3 at 3

(Def.'s Ex. 1) (Verderosa Decl. ¶ 5); nor have they expounded on the burden of providing

Dodson that evidence or sought to explain the practical value that reviewing that evidence would

have added to Dodson's ability to contest the CP-535s with Chief Verderosa—particularly as

compared with the factual contests that Dodson did set forth in his counsel's May 9 letter.

Lastly, neither Dodson nor the USCP has addressed whether a post-termination hearing would be

available to Dodson, if necessary, and whether such a hearing could, at this stage, remediate any

procedural deficiencies of Dodson's pretermination process.

When combined with the threshold question whether Chief Verderosa precluded Dodson

from pursuing a grievance, the Court is therefore constrained to conclude that neither party is

entitled to summary judgment on Dodson's due process claim.  The Court will, accordingly,

deny both the USCP's and Dodson's motions for summary judgment on that claim.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant's motion for summary

judgment, Dkt. 42, is **GRANTED** in part as to Plaintiff's retaliation claim and **DENIED** in part

as to Plaintiff's disparate treatment and procedural-due-process claims.  It is further **ORDERED**

that Plaintiff's partial cross-motion for summary judgment, Dkt. 54, is **DENIED**.  It is further

**ORDERED** that the parties shall, on or before November 15, 2022, file a joint status report with

the Court proposing a schedule for further proceedings in this matter.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  September 30, 2022